IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NEUBERGER BERMAN REAL ESTATE      *
INCOME FUND, INC.
                                  *   CIVIL NO. AMD-04-3056
    V.
                                  *
LOLA BROWN TRUST NO. 1B, ET AL.
                                  *


MEMORANDUM OPINION AND ORDER


     This case is currently before the Court on two discovery
motions (Paper Nos. 73 and 99.)  By Order dated March 25,
2005, Judge Andre M. Davis referred to the undersigned the
determination of the discovery disputes.  (Paper No. 101.)  A
status conference on the pending matter was held on March 31,
2005, and a telephone hearing held on April 22, 2005.

     For the reasons set forth below, the Court rules as
follows, on the pending motions:

1.   Plaintiff's Motion to Compel Production of Documents
     Improperly Withheld on the Basis of Privilege is
     GRANTED in part and DENIED in part.

2.   Plaintiff's Motion to Compel Production of Documents
     and Responses to Deposition Questions and
     Interrogatories is GRANTED in part and DENIED in
     part.

This memorandum will discuss each motion seriatim.

## Background Facts

Plaintiff Neuberger Berman Real Estate Income Fund, Inc. ("NRL"), a closed-end fund investing primarily in real estate securities, seeks responses to its various discovery requests related to the tender offer made by the defendant Trusts for a controlling number of its shares.  The present discovery dispute arises from defendants' assertions of attorney-client privilege and work product doctrine over documents and over communications (1) between and among the defendants, (2) between the defendants and related non-party entities, (3) between related non-party entities, and/or their respective counsel.  All of these documents, however, are within the possession, control or custody of the defendants, identified as responsive to plaintiff's discovery requests, but withheld as protected under the attorney-client privilege or work product doctrine.  A description of the various defendants and related entities and the relationship between the defendants and other related non-party entities is essential to understand the dispute.[1]

Defendants Lola Brown Trust No. 1B ("Lola Trust") and

---

[1] Unless otherwise indicated, this description is based on the complaint, the second Miller affidavit and attachments, and defendants' briefing.

Ernest Horejsi Trust No. 1B ("Ernest Trust") are irrevocable grantor trusts ("Trusts") domiciled and administered in South Dakota.  The beneficiaries of the Trusts are defendant Stewart R. Horejsi ("Horejsi"), his issue, and their spouses.  (Paper No. 124 Ex. A.)

Defendant Horejsi is a private investor, portfolio manager for Boulder Investment Advisors ("BIA") and Stewart Investment Advisors ("SIA"), two non-defendant investment companies servicing the Trusts, and, as stated above, a beneficiary of the Lola and Ernest Trusts.  He also serves as an advisor to the Trusts.  (Paper No. 55 at 4.)

The remaining defendants are sued in their capacity as trustees of the Trusts.  Defendant Badlands Trust Company ("Badlands") is a South Dakota corporation that acts as the administrative trustee of Lola Trust and Ernest Trust and of the other non-party Horejsi family trusts.[2]  (Id. at 3.)

---

[2] There are several other Horejsi family trusts ("the trusts")-not parties in the case-worth noting because of their interrelation with the Lola Trust and Ernest Trust and other entities described below.  The Mildred B. Horejsi Trust was created by Horejsi's mother (wife of Ernest) and benefits Horejsi and his issue. Horejsi granted his own trust, Stewart Horejsi Trust No. 2 to benefit his issue and their spouses.  John Horejsi, defendant Horejsi's son, granted the John Horejsi Trust, and Susan Ciciora, defendant Horejsi's daughter, granted the Susan Ciciora Trust.  Finally, there are two additional off-shore trusts granted by defendant Horejsi: the Evergreen Trust and the Stewart West Indies Trust.
The purpose of all the aforementioned trusts is to invest in securities.

Defendant Susan L. Ciciora is the daughter of defendant Horejsi, a beneficiary of the defendant Trusts, and serves as a trustee of Lola Trust and Ernest Trust.  (<u>Id.</u> at 4.) Defendant Larry L. Dunlap serves as a trustee of Lola Trust and Ernest Trust.  (<u>Id.</u> at 3-4.)

The defendant Trusts invest in a number of closed-end mutual funds, not parties in the instant action, Boulder Total Return Fund ("BTF"), Boulder Growth & Income Fund, Inc. ("BIF"), and First Financial Fund ("FFF").  The Trusts and other non-party Horejsi family trusts ("trusts") together own a controlling interest in these funds and also own Fund Administrative Services[3] ("FAS"), which provides administrative services to the funds and others and own BIA and SIA which provide investment advice to the funds.[4]  (Paper No. 97 at 6-8.)  The exact interest of the defendant Trusts in these funds is not clear.  The funds pay FAS, BIA, and SIA for

---

[3]  FAS services not only the funds, but also provides financial, bookkeeping, administrative and investment services to the Trusts, the other non-party Horejsi family trusts, and the investment advisor companies (BIA and SIA).

[4]  Although the Trusts and non-party Horejsi family trusts own a controlling interest in all three funds, the trusts' wholly owned investment advisor companies BIA and SIA do not provide investment advice to FFF.

Horejsi serves as the portfolio manager for both BIA and SIA, which are co-investment advisers to two closed-end investment companies, Boulder Total Return Fund ("BTF") and Boulder Growth & Income Fund, Inc. ("BIF").

their services.  While the defendant Trusts ultimately benefit

from this business relationship because the funds are paying

fees to the investment companies and to the  administrative

services company owned partly by the Trusts, no legal

relationship (as opposed to this financial relationship)

exists among the Horejsi entities,[5] the defendant Trusts,

other Horejsi trusts, and the funds.

For purposes of the discussion of the discovery issues at

hand, the Court notes that only defendant Lola Trust has an

interest in these other non-party entities.  It is a fifty

(50) percent member of both BIA and FAS.[6]  Ernest Trust is not

a member of any other related Horejsi entity.  Further, the

funds have no legal relationship to the Horejsi trusts and

entities beyond the trusts' controlling financial interest.

---

[5]  "Entities" refers to the various LLCs created to provide
various services to the funds and trusts: BIA, SIA, FAS, and
Evergreen Atlantic LLC.  At times, the Court will refer to "entities"
as all the various Horejsi trusts and LLCs.

[6]  Evergreen Atlantic LLC is the other 50% member of BIA.
Evergreen Atlantic, in turn, is owned by the following interests:
Evergreen Trust, 11%, John Horejsi Trust, 15%, Susan Ciciora Trust,
30%, and Stewart West Indies Trust, 44%.  These trusts therefore own
the fifty percent share of BIA in proportion to their membership
interest in Evergreen Atlantic.
    Similarly, Evergreen Atlantic is the other 50% percent member
of FAS.  The non-defendant trusts mentioned above own FAS in
proportion to their membership interest in Evergreen Atlantic.
    SIA, on the other hand, is wholly owned by the non-defendant
Stewart West Indies Trust.

The Court notes one other non-party, Stephen C. Miller ("Miller"), who is integral to the discussion of the discovery dispute because of the many roles he fulfills at the defendant Trusts, the entities, and the funds.  Miller is the self-described personal attorney to defendant Horejsi and his family.  (Paper No. 124 at 1.)  He serves as general counsel to the defendant Trusts, Badlands, FAS, SIA, BIA, and FAS. (Id. at 2.)  He also provides general counsel services to the three funds, and serves as their chief compliance officer. (Id.)  Finally, he has served in various officer positions for the various Horejsi family related entities, such as SIA.

## Discussion

### I.

### Motion to Compel Production of Documents
### Improperly Withheld on the Basis of Privilege

Neuberger Berman Real Estate Income Fund Inc. ("NRL") has moved to compel

(1)  Rule 26(a) disclosures.  Throughout the briefing subsequent to this December motion, plaintiff has not provided any support for the inadequacy of the Rule 26(a) disclosures. The Court assumes the plaintiff has abandoned this claim of deficiency given the progress of the litigation since first raised.

(2)  <u>A proper privilege log</u>.  The Court will treat this
request for relief as moot.  As set forth below, the court has
found defendants' privilege logs insufficient under the
guidelines and case law.  No purpose would be served by
requiring defendants to provide further privilege logs at this
point in the litigation.  However, defendants' failure to
produce a proper privilege log was a cause, in part, for the
filing of the motion to compel and that failure will be
addressed, as it forms part of the basis for the Court's
proposed imposition of expenses under Fed. R. Civ. P. 37.

(3)  <u>Responses to request nos. 3 and 16</u>.  The Court
grants this requested relief and the documents are due July 1.


**Request No. 3:**  All documents requested by the Members of
the Special Committee of the Board of Directors of NRL in the
letter from Arthur C. Delbert to Stephen C. Miller, dated
September 14, 2004.

**Response No. 3:**  Defendants object to Request for
Production of Documents No. 3 as improper and contrary to the
Joint Discovery Plan agreed to by the parties.  Request for
Production of Documents No. 3, by its incorporation of the
Delbert document request, is actually thirty-three separate
requests for documents and thereby would cause this Request
For Production of Documents to violate the limit on document
requests agreed to by the parties.  The thirty-three separate
requests in the Delibert letter are also substantially
cumulative of other requests herein, pursuant to which
documents are being produced.

As to request no. 3, the Court grants the motion to

compel.  The Court construes request no. 3, which asks for all
documents requested in a certain letter, as a single request
even though the letter itself asks for 33 documents.  The
limit on number of requests is to prevent abuse of discovery.
Rarely, if ever, does a request ask for a single document or
does a request, however phrased, produce only a single
document in response.  In short, a request for a category of
documents or documents on a single subject is normal and
permissible.

**Request No. 16:**  Documents sufficient to show the
ownership, principal business, corporate purpose, and assets
and liabilities of Badlands Trust Company, Fund Administrative
Services LLC, BIA, SIA, Horejsi Inc., Stewart Advisors, Inc.,
Evergreen Atlantic LLC, and Stewart Aviation LLC.

**Response No. 16:**  Defendants object to the Request
because it is multitudinous and compound and violates the
limits on Requests in the Discovery Plan, since it asks for
four different categories of documents from eight different
entities, seven of which are not parties to this matter.
Defendants will produce any responsive, non-privileged
documents at the agreed upon time subject to the terms of an
acceptable protective order pertaining to Defendant Badlands
Trust Company.

As to request no. 16, the information seems highly
relevant given that the interrelated nature of the entities is
key to issues in the litigation, and the defendants treat
these entities (with the possible exception of Stewart
Aviation LLC), as one -- referring to them as the "Horejsi
affiliates." (See First Miller Decl. ¶ 5; Second Miller Decl.

8

¶¶ 5, 6.)  All of these entities, except Stewart Aviation,

LLC, and Stewart Advisors, Inc., are said to share a common

legal interest.  Id.  Accordingly, the Court grants the motion

to compel, except as to Stewart Aviation, LLC, but including

Stewart Advisors, Inc., given  the similarity of apparent

function and name to another admitted Horejsi affiliated

entity, Stewart Investment Advisors.

(4)  The non-privileged documents of the defendants
responsive to its requests for production now withheld based
on claims of attorney-client and work product privilege.

The first three requests for relief were easy to address.

The fourth request has proven more complicated.  The core of

the problem has been the defendants' withholding of a massive

amount of documents initially -- over 50% of all documents

identified as responsive according to plaintiff -- with

little, if any, enlightening analysis, explanation or support,

either on a document-by-document basis or even on a meaningful

category-by-category basis, with reference to specific

documents by Bates stamp numbers.  Over the course of the five

months since defendants' document responses were due, the

defendants provided some more information on the privilege

log, withdrew some assertions of privilege (but tried to

reassert others), reduced the number of withheld documents by

elimination of duplicates, provided additional affidavits,

submitted increasingly focused legal memoranda that developed and set out legal positions for its privileged stances, and even produced some documents to plaintiff.

However, what defendants failed to do, to the very end when the Court finally terminated further filings, is set out for the Court a cogent presentation of the facts and governing pertinent law on a document-by-document basis or on a meaningful, category-by-category basis, tied to the still voluminous quantity of withheld documents.  Given that defendants bear the burden of supporting the privilege, the defendants' failure ultimately is their own loss, but that failure has complicated and prolonged the resolution of the dispute and required expenditure of significant judicial resources.  As one Court observed: counsel should not treat judges as if we were "pigs hunting for truffles buried in briefs."  U.S. v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991). The Court has now completed its analysis and in camera review of documents, and has done its best given the chaotic, jumbled presentation.  The Court has ordered the production of the vast majority of the documents withheld and has scheduled its rulings on the accompanying annotated May 2 privilege log.[7]

---

[7] The log has been filed under seal in conformance with the parties' practice with the logs submitted to the Court.

However, an understanding of the Court's rulings on the documents and deposition questions as well as its proposed imposition of sanctions under Fed. R. Civ. P. 37 requires a review of the history of the discovery dispute and a review of the governing law.

## History of the Discovery Dispute

On **November 8, 2004**, the plaintiff served its First Request for Production of Documents on the defendants. (Paper No. 73 Ex. 2.)[8]  On **November 23, 2004**, the two defendant Trusts and Badlands Trust Company filed their "Responses and Objections to Plaintiff's First Request for Production of

---

[8] In the "Definitions" section, no. 4, the plaintiff defined "document" as "any document in the possession, custody, or control of the entities to whom this document request is directed (together with any predecessors, successors, affiliates, subsidiaries or divisions thereof, and their officers, directors, employees, agents and attorneys).  Without limiting the term "control" as used in the preceding sentence, a person is deemed to be in control of a document if the person has the right to secure the document or a copy thereof from another person having actual possession thereof."  In the "Instructions" section, ¶ C, plaintiff stated that "[t]he documents covered by this request include all documents in your possession, custody or control."  Additionally, the Instructions stated that

> Pursuant to Fed. R. Civ. P. 34, you shall produce all documents in the manner in which they are maintained in the usual course of business and/or you shall organize and label the documents to correspond with the categories in this request.  A request for a document shall be deemed to include any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself.

Documents" (Id. Ex. 3.)[9]  In those responses, ¶ I, defendants objected to plaintiff's request for production of documents "to the extent the requests seek documents not in Defendants' custody and control."  They objected to the definition of "Trusts" as overbroad and burdensome and as including trusts not named as parties to this action and limited their production of documents to only include the Ernest Trust and Lola Trust.  (Id. Ex. 3, ¶ E.)  As to all the requests, except nos. 3 and 16, defendants answered either that "any responsive, non-privileged documents [will be produced] at an agreed upon time subject to the terms of an acceptable protective order" or that defendants "possess no such documents" except as specifically identified.  (Id. Ex. 3.)

Thereafter on **December 11, 2004**, defendants produced some documents - "LOLA 00001-LOLA 08436."[10]  **On December 16, 2004**, defendants served NRL with a privilege log, withholding approximately 680 documents asserting "attorney/client" and

---

[9] The individual defendants initially refused to produce any documents based on their pending motion to dismiss.  (Paper No. 73 Ex. 3, ¶ c).  There is no basis in the Local Rules or governing case law for what plaintiff correctly characterizes as defendants "self-imposed stay of discovery."  After that motion was denied, the individual defendants stated that they had no documents additional to documents produced by the Trusts and Badlands.

[10] All documents presented to the Court had either a "LOLA" prefix, identifying it as a LOLA Trust document or a "BTC" prefix, identifying as a Badlands Trust document.

"work

product privilege" as to each and every document.   On
**December 22, 2004**, plaintiff complained about the
insufficiency of the log, and, on **December 27, 2004**, served on
defendants this instant motion to compel.[11]

On **January 14, 2005**, defendants submitted a revised log.
Plaintiff asserted this log was insufficient and demanded in
light of the continued insufficiency of the log that
defendants produce the withheld documents.   In that log,
defendants did not provide either as part of the log or in
separate documentation any greater explanation or any

_____

[11] Briefing continued between the parties on the sufficiency of
the privilege log and the discoverability of the withheld documents
through May 6, 2005.  Defendants submitted their opposition on
February 2, 2005, (Paper No. 88), and plaintiff replied on February
23, 2005.  (Paper No. 94).  Defendants moved to file a surreply,
(Paper No. 97, Ex. 2), which the Court granted on March 31, 2005.
Plaintiff, as movant, was allowed to file a surreply, and did so on
April 4, 2005.  (Paper No. 108).

In an April 22 letter order, the Court allowed, inter alia,
defendants' submission of additional support for their assertions of
privilege, by April 29, 2005.  (In that telephone hearing, the Court
asked how much time lead defense counsel needed to review the
withheld documents and present additional support.  Defense counsel
asked for a week, which the Court granted.)  Thereafter, defendants
sought additional time, which the Court denied, but stated defendants
could have until May 2 to provide the documents themselves.  The
defendants did not provide the new log on April 29 which the Court
expected.  Nonetheless, the Court accepted and reviewed the log
belatedly submitted on May 2, and withheld documents.  The defendants
without leave submitted a third Miller declaration on May 5 and a
further legal memorandum on May 9 to which plaintiff objected.  The
Court agreed that these submissions were without leave, that
defendants had had more than ample opportunity to present their case
on privilege, and declined to consider them.

rationale for the privileged status of documents.  The only
change was to identify among the previously identified
"parties" to the document whether they were author, recipient,
or carbon copy recipient.  Defendants withdrew its assertion
of work product privilege as to all but 43 documents, but
maintained the applicability of the attorney-client privilege
as to all of the 680 documents.

Pursuant to Judge Davis' referral of all discovery
disputes,  the Court held a telephone conference **March 31,
2005**, at defense counsel's request, agreed to review in camera
the withheld documents (which defendants' counsel informed the
Court were minimal -- less than a box), and ordered defendants
to supplement the privilege log (identifying as to each
addressee and author in each document the entity that person
is acting for.)

In **early April**, the defendants had delivered to the Court
two boxes of documents, still largely unorganized and
unanalyzed and containing numerous duplicates.  In the
accompanying April privilege log, defendants asserted work
product privilege as to 24 documents of the previous 43
documents withheld on that basis, but maintained the
applicability of attorney-client privilege to all the
documents.  The defendants did provide the capacity of each

14

person in the log,[12] but provided no demonstration of the

context and circumstances of the document to support either

the work product or attorney-client privilege.  After a review

of the parties' memoranda and some of the two boxes of

documents, the Court issued a letter order dated **April 22,**

**2005**, providing:

> I have concluded that defendants have mis-
> interpreted the attorney-client and work product
> privileges to a significant degree, withholding many
> documents improperly under these narrowly drawn
> privileges, as defined in the law.  As a result, I
> require that Mr. Hulme, as lead counsel, or another
> of his law partners and counsel of record in the
> case, certify that he has reviewed all documents
> proposed to be withheld on the basis of privilege
> under the governing law and provide support in
> affidavit form for the assertion of the privilege as
> to each document [by April 29].

Subsequent to that April 22 Order, defendants submitted

on **May 2**, another set of withheld documents[13] with another

---

[12] The first April log submitted had the name of the individual,
but his capacity on a separate sheet, requiring the Court to juggle
two documents in its review of each document.  At the Court's
request, the defendants submitted the information on one log shortly
thereafter -- the second April log.

[13] The duplicates were almost entirely removed, or if not
removed, identified as such, expediting review.  The documents were
physically organized in three binders.  There was a helpful
organization of the emails.  However, there was still not any
meaningful substantive organization for purpose of analysis -- either
in the logs themselves or in another document identifying and
classifying documents with accompanying legal arguments and factual
support.

privilege log, in which the work product privilege was asserted for 230 documents.  Of those 230 documents, the work product privilege had been asserted for only six of them on the April log.  (Tabs 7, 46, U, AA.)  Accordingly, the work product privilege was  asserted for some 226 documents in the May log but not asserted in the April log.

Defendants' initial responses were plainly inadequate. Defendants had an obligation on December 17, 2004, to produce all responsive non-privileged documents and to identify all documents withheld on the basis of privilege on a log, in conformance with Fed. R. Civ. P. 26(b)(5) and plenary case law.  As discussed <u>infra</u>, on December 17, 2004, the defendants also had the burden of demonstrating the applicability of the asserted privileges on a document-by-document basis as a matter of fact through submission of supporting documentation, including affidavits, deposition excerpts, etc.  This, the Court finds, the defendants failed to do.

First, the initial privilege log did not comport with the requirements of Fed. R. Civ. P. 26(b)(5), Guideline 9 of the Discovery Guidelines of the United States District Court for the District of Maryland, and governing case law.[14]  For

---

[14] <u>United States v. Construction Products Research, Inc.</u>, 73 F.3d 464 (2d Cir. 1996) (<u>quoting</u> <u>Bowne of New York City, Inc. v. AmBase Corp.</u>, 150 F.R.D. 465, 474 (S.D.N.Y. 1993)); ("To facilitate

each document withheld, the privilege asserted was

"Attorney/Client Work Product."  The description of the

document and the mere identification of the names of the

parties to the communication did not "enable [plaintiff] to

assess the applicability of the privilege . . ."  Fed. R. Civ.

P. 26(b)(5).  Each entry asserts the work product doctrine as

a basis for withholding the document, but many entries do not

identify any anticipated, imminent or pending litigation.  The

description of the document was too general to be elucidating.

Additionally, the mere identification of the parties to the

communications without specification of "the relationship of

the author, addressee, custodian and any other recipient to

--------------------------------

its determination of privilege," a court, as in this case, "may
require 'an adequately detailed privilege log in conjunction with
evidentiary submissions to fill in any factual gaps.'")  It has
further been stated that:

> The standard for testing the adequacy of the privilege log
> is whether, as to each document, it sets forth facts that,
> if credited, would suffice to establish each element of
> the privilege or immunity that is claimed.  The focus is
> on the specific descriptive portion of the log, and not on
> conclusory invocations of the privilege or work-product
> rule, since the burden of the party withholding documents
> cannot be "discharged by mere conclusory or ipse dixit
> assertions."

Golden Trade S.r.L. v. Lee Apparel Co., 1992 Dist. LEXIS 17739 **12-
13 (S.D.N.Y. 1992) (quoting von Bulow v. von Bulow, 811 F.2d 136, 144
(2d Cir.), cert. denied, 481 U.S. 1015 (1987)).  Allendale Mut. Ins.
Co. v. Bull Data Sys, Inc., 145 F.R.D. 84-, 85 (N.D. Ill. 1992).
(stating that a privilege log should provide "a specific explanation
of why the document is privileged.").

each other" does not comply with Guideline 9, the rule and case law -- the goal of which is to allow the propounding party enough information to permit an evaluation of the assertion of the privilege and the Court enough information to rule.  Many entries identify "Directors" or "Board of Directors" in the "Between" column, but do not identify the entity that these directors purportedly serve.  The positions and roles of the identified parties to the communications are not given.  Plaintiff's counsel advised defense counsel of these and other deficiencies.  (Paper No. 94 Stacy Decl. Ex. 5.)

Second, and most critically, the defendants did not provide the context and circumstances to demonstrate the privilege as to each document, or indeed even by reference to categories of documents by Bates numbers.

While defendants' subsequent privilege logs improved, the defendants' submissions remained deficient under the guidelines and governing law.  The revised privilege log produced on January 14, 2005, did provide the "author" and "recipient" by name, but did not address any of the other considerable deficiencies.  Apparently, in response to plaintiff's counsel's observation that "each entry asserts the work product doctrine as a basis for withholding the document,

but many entries do not identify any anticipated, imminent or pending litigation," the revised log omitted assertion of the work product privilege as a basis for withholding the document for all but 32 documents.  While the third privilege log submitted in early April did provide the capacity or role of the parties toward meeting defendant's burden of supporting their privilege assertions, that did not cure the deficiencies.  In none of the December, January, or early April submissions did defendants provide any documentation supporting the work product privilege.  Only in affidavits submitted by Messrs. Miller and Stephens on April 29, 2005, is any factual support provided for the assertion of a work product doctrine and only then for unspecified documents authored on or after July 4, 2004.  Similarly, defendants did not provide the context and circumstances for the attorney-client privilege on a document-by-document basis, continuing to rely on the asserted status of the participants and the interrelationship of the various Horejsi entities.

Moreover, in their opposition, defendants attempted to shift the burden to plaintiff.  "Plaintiff has not asked for the production of specific documents listed on defendants' privilege log.  As such, this opposition does not provide a document by document defense of the listed communications."

(Paper No. 88 at  1.)  The plaintiff did attempt to categorize
the documents being withheld based on the limited information
provided, asking defendants to produce the following
categories of documents:

    (1)   documents reflecting communications concerning NRL
        from or to employees of Boulder Investment Advisors,
        Stewart Investment Advisors or Fund Administrative
        Services;

    (2)   communications from or to the Trusts' accountant,
        Harry Abromeit;[15]

    (3)   communications between Stewart Horejsi and Stephen
        Miller; and

    (4)   communications between Stewart Horejsi and other
        attorneys for the Trusts.

(Paper No. 88 Att. A.)

That attempt did not excuse defendants' duty to provide a
document-by-document explication of privileged status.
Moreover, as to three of the plaintiff-identified categories,
the defendants asserted a blanket privilege based on few,
questionable factual assertions.  As to category no. 1
"communications concerning NRL from or to employees of BIA,
SIA or FAS," defendants declare that:

    FAS employees communications with Steve Miller and
    Tom Stephens are privileged communications with
    their attorney.  They are privileged because FAS is
    acting as the agent of the Trusts and Badlands and
    because Steve Miller and Tom Stephens are counsel to

_____

    [15] Defendants later agreed to provide these documents.

the Trusts, Badlands and FAS.

* * *

Communications listed on the privilege log between
FAS employees and Steve Miller or Tom Stephens are
either requests for legal advice, provision of legal
advice, or provision of information to Mr. Miller or
Mr. Stephens for use in the provision of legal
advice.

(Paper No. 88 at 5.)

Similarly, defendants claim a blanket privilege as to

category nos. 3 and 4 communications between Stewart Horejsi,

Steven Miller and Tom Stephens because of

the fact that both Steve Miller and Tom Stephens
have a direct attorney-client relationship with Mr.
Horejsi.  Further Mr. Horejsi acts as agent, in
various capacities, of the defendants and his
communications are privileged as the representative
of the defendants.

(Paper No. 88 at 6.)

Until April 29, the sole factual support for these

blanket assertions of privilege was the first affidavit of

Stephen Miller, who variously claims to be the "personal

attorney to Stewart Horejsi and his family," (Paper No. 88

Att. B, ¶ 4,) "the General Counsel for the Horejsi affiliates

(Badlands Trust Co., LLC, Fund Administrative Services,

Stewart Investment Advisors, Boulder Investment Advisors,

Inc., Lola Brown Trust No. 1B and Ernest Horejsi Trust No.

1B)," (Id. ¶ 5,) and "chief legal officer and attorney for the

Boulder Total Return Fund, Boulder Growth and Income Fund and
First Financial Fund." (<u>Id.</u>)  Despite his acknowledged
"officer titles for the various Horejsi affiliates," Mr.
Miller attests that "[n]inety percent or more of [his] work .
. . perform[ed] for the Horejsi affiliates is the provision of
legal advice or oversight as General Counsel or Chief Legal
Officer." (<u>Id.</u> ¶¶ 6, 7.)[16]  Finally, he simply declares
without any further detail or indeed without any reference to
any specific document among the many withheld that
"[c]ommunications listed on defendants' privilege log between
Mr. Horejsi, himself and/or Tom Stephens are requests for a
provision of legal advice in the following categories: (1)
trust formation or administration, (2) application of
Securities and Exchange regulation and securities law to Mr.
Horejsi's investment activities, and (3) the activities giving
rise to this litigation." (<u>Id.</u> ¶ 14.)

As stated earlier, on April 22, the Court ordered lead
counsel to review the voluminous withheld documents and, over
the strenuous objections of plaintiff, allowed the defendants
to provide satisfactory  documentation of the privilege on a

---

[16] The plaintiff effectively impeaches the affidavit through
presentation of the offer statement filed with the SEC by the Trusts
in which Mr. Miller is portrayed as spending his time as an officer
and director of various Horejsi entities.

document-by-document basis.  While defendants submitted
another Miller affidavit and an affidavit of Thomas R.
Stephens, neither affidavit provides the detailed, factual
predicate necessary for privilege as to the still large volume
of withheld documents.

The first Miller affidavit is general and conclusory,
relying mistakenly on his status as a lawyer and status of the
other party to the communication as a client, or agent of a
client, to shield documents from discovery and failing to
provide the factual support document-by-document.  (Paper No.
88 Att. B).  The second Miller affidavit repeats his status as
attorney to Mr. Horejsi and "the numerous entities affiliated
with the interests of Mr. Horejsi and his family" and, for the
first time, asserts that various entities, including the Lola
Brown Trust, Ernest Horejsi Trust, the Mildred B. Horejsi
Trust, the Stewart Horejsi Trust No. 2, the John Horejsi
Trust, the Susan Ciciora Trust, the Evergreen Trust, the
Stewart West Indies Trust, and Evergreen Atlantic LLC, BIA,
FAS, SIA and Badlands Trust Co., all have a "common legal
interest," and that "because of that common legal interest
[Mr. Miller] frequently act[s] as counsel for two or more of
[these entities] simultaneously and receive[s] communications
regarding legal matters to two or more of them, and share[s]

communications from one or more of them with one or more others of them.  Those communications are made with an expectation and that those communications will remain subject to the attorney-client privilege and the attorney work-product where applicable." (Paper No. 124 Miller Decl., ¶ 6.)

Mr. Stephens' affidavit states that his firm has served as special outside counsel to the Trusts and various entities related to Trusts. (See id. Stephens Decl., ¶ 6; Miller Decl. ¶ 8.)  He describes generally his work regarding the takeover and asserts that his law firm "does not provide business advice to the Trusts or the individuals and [Horejsi related] entities and our advice to the Trusts is limited to legal matters." (Id. Stephens Decl., ¶ 4).

Finally, both gentlemen's affidavits declare that as of July 4, 2004, they were acting in anticipation of litigation in their actions in the planning of the tender offer.

Similarly, none of the defendants' legal briefing provided a foundation for these sweeping assertions of attorney-client privilege and work product doctrine, and while mention was made of a "common legal interest" in an attachment to the second Miller affidavit, no legal analysis was presented as to why this doctrine applied under the specific facts of this case as to specific documents.

Defendants clearly failed to satisfy their burden.  As to
the assertion of the attorney-client privilege, we are simply
asked to believe that Mr. Miller (or Mr. Stephens or Mr.
Horejsi) was at the time of the communication (no specific
documents were referenced by Bates numbers), engaged in the
request for, or response to, legal advice and acting in
whatever capacity (and no other) that would insure its
confidential status and thus privileged nature as an attorney-
client communication.  There is thus no document-by- document
demonstration of the elements required under the governing law
of attorney-client privilege.

Moreover, as to the assertion of a common legal interest
(an extension of the attorney-client privilege), we are asked
to assume the "common legal interest" applies to every
communication between or among any of these identified Horejsi
related entities (including the defendant Trusts), allowing
the defendants to assert privilege for all communications of
any of these entities, due to their "affiliated" status.

Finally, as to the assertion of a work product doctrine,
the affidavits claim blanket work product doctrine protection
for all documents after July 4, 2004.  Defendants provide no
case law that such anticipation of litigation in the planning
stage of a takeover attempt is either reasonable or the

25

factual context here – just self-serving conclusions.  More
basically, the defendants did not assert the work product
doctrine for all these documents consistently.  While some
were scheduled on one of the several prior privilege logs as
protected by the work product doctrine, it was disavowed in
later logs when the basis was challenged.

The defendants have sorely misunderstood the demanding
and limited nature of the attorney-client, the common legal
interest extension of the attorney-client privilege, and the
work product doctrine.  While the Court understands the
complexity of large document productions, defendants' failure
to take seriously their responsibilities under the law here is
stunning.  Defendants' failure to repeatedly comply with their
obligations under the rules and governing law has delayed
plaintiff's discovery, slowed down the resolution of the
dispute, unnecessarily complicated the discovery process, and
resulted in unnecessary cost.  Delay can be nearly as
effective in the concealment of facts as outright destruction
in interfering with the prosecution of a case.

The Court has now conducted an <u>in camera</u> review of the
withheld documents submitted on May 2 in light of all support
defendants timely offered in support of its privilege
assertions through May 2.  The Court's rulings are included on

26

the May 2 privilege log, and were made consistent with the governing case law set forth below.

**Governing Law**

**1.   Attorney-Client Privilege**

The purpose of the attorney-client privilege is "to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  The privilege has a "venerable pedigree" and is established in the specialized federal common law.  United States v. (Under Seal), 748 F.2d 871, 874 (4th Cir. 1984).  However, because the privilege interferes with the truth seeking process and "is in derogation of the public's right to every man's evidence," it is "not favored by the federal courts" and "is to be strictly confined within the narrowest possible limits consistent with the logic of its principle."  In re Grand Jury Proceedings, 727 F.2d 1352, 1355 (4th Cir. 1984).

The traditional test for determining the applicability of the privilege was enunciated by Judge Wyzanski in United States v. United Shoe Machinery Corp., 89 F.Supp. 357 (D. Mass. 1950):

The privilege applies only if

27

(1) the asserted holder of the privilege is or sought to become a client;

(2) the person to whom the communication was made (a) is a member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer;

(3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purposes of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and

(4) the privilege has been (a) claimed and (b) not waived by the client.[17]

Id. at 358-59.  This passage has been quoted with approval by the Fourth Circuit.  United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982).

The burden is on the proponent of the privilege to demonstrate "not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived."  Id. Accord United States v. Martin Marietta, 886 F. Supp. 1243, 1244 (D. Md. 1995).  As the Fourth Circuit explained in (Under Seal), 748 F.2d at 876, "[i]n practical terms, this burden

---

[17] The defendants did not provide the documents in the ordinary course of business nor in the file folders in which they were found, as plaintiff requested.  There is no indication that the documents were maintained separately -- one entity's files from another's. Rather, all the documents appear to be produced from Lola Trust or Badlands files per the Bates-stamp prefixes.

requires the proponent to explain, through <u>ex</u> <u>parte</u>
submissions if necessary to maintain confidentiality, the
significance or meaning of an otherwise cryptic document."
"It is incumbent upon the proponent to specifically and
factually support his claim of privilege, usually by
affidavit, to satisfy this burden, and an improperly asserted
privilege is the equivalent of no privilege at all."  <u>Byrnes</u>
<u>v. Jetnet Corp.</u>, 111 F.R.D. 68, 71 (M.D.N.C. 1986).[18]  The
party withholding the document, of course, must provide that
context by way of evidence, not just argument.

"[T]he 'essence' of the attorney-client privilege is the
protection of what was 'expressly made confidential or should

---

[18] <u>Accord</u> <u>Construction Products</u>, 73 F.3d at 473 (noting,
however, that information such as the relationship between
individuals not normally in privileged relationship is typically
provided by deposition testimony or affidavit as opposed to a
privilege log.); <u>In re Grand Jury Investigation</u>, 974 F.2d 1068, 1071
(9th Cir. 1992);  <u>Suggs v. Whitaker</u>, 152 F.R.D. 501, 505 (M.D.N.C.
1993) (stating that proponent of the privilege must "come forward
with a specific demonstration of facts supporting the requested
protection," preferably through affidavits from knowledgeable
persons); <u>Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.</u>, 145 F.R.D.
84, 88 (N.D. Ill. 1992); <u>North Carolina Electric Membership Corp. v.</u>
<u>Carolina Power & Light Co.</u>, 110 F.R.D. 511, 515 (M.D.N.C.
1986)(noting that courts require that the applicability of the
privilege be shown "by affidavit that precise facts exist to support
the claim of privilege."); <u>Barr Marine Products Co., Inc. v. Borg-</u>
<u>Warner Corp.</u>, 84 F.R.D. 631, 636 (E.D. Pa. 1979).  ("[A] party
resisting discovery on the ground of the attorney-client privilege
must by affidavit show sufficient facts as to bring the identified
and described document within the narrow confines of the privilege.
Nor will submitting a batch of documents to the Court <u>in</u> <u>camera</u>
provide an adequate or suitable substitute.").

reasonably be assumed. . . .'" <u>Sheet Metal Workers</u>
<u>International Assoc. v. Sweeney</u>, 29 F.3d 120, 125 (4th Cir.
1994).  Hence, "any voluntary disclosure by the client to a
third party waives the privilege not only as to the specific
communication disclosed but often as to all other
communications relating to the same subject matter." <u>United</u>
<u>States v. Jones</u>, 696 F.2d 1069, 1072 (4th Cir. 1982).

The fact that there is an attorney-client relationship
does not, as the defendants appear to assume, endow all
communications between the attorney and client with a
privileged status, shielding them from disclosure.  The Fourth
Circuit has spoken unequivocally on this point: "it is the
unquestioned rule that the mere relationship of attorney-
client does not warrant a presumption of confidentiality."
<u>(Under Seal)</u>, 748 F.2d at 875.

Under the definition of attorney-client privilege in the
seminal case of <u>United States v. United Shoe Machinery</u>, the
privilege applies if the communications are primarily for the
purpose of securing legal advice.  89 F. Supp. 357, 358-59 (D.
Mass. 1950).  "To determine whether communications were made
primarily for the purpose of [seeking or] providing legal
services, the court must consider the context in which they
were made." <u>U.S. v. Cohn</u>, 303 F. Supp. 672, 684 (D. Md.

2003).   Commentators generally agree that courts have not
reached any consensus as to the "degree of predominance that
must be assigned to the legal aspects of a communication."
Snider & Ellins, Corporate Privilege and Confidential
Information, § 2.05 (2004).   On one hand, some courts require
that the claimant demonstrates that the communication would
not have taken place "but for" the need for legal advice.
E.g., First Chicago Int'l v. United Exchange Co. Ltd., 125
F.R.D. 55, 57 (S.D.N.Y. 1989).   On the other hand, some courts
more broadly construe a client's purpose in communicating with
an attorney and apply the privilege to communications intended
to keep counsel abreast of business matters.   E.g., Simon v.
G.D. Searle & Co., 816 F.2d 397 (8th Cir. 1987).   Although the
Fourth Circuit has not explicitly adopted one approach, the
"but for" formulation is more consistent with the Fourth
Circuit's narrow interpretation of the attorney-client
privilege.   In re Grand Jury Proceedings, 727 F.2d 1352, 1355-
1356 (4th Cir. 1984) ("the privilege applies only when the
persons claiming the privilege has as a client consulted an
attorney for the purpose of securing a legal opinion or
services . . ."); (Under Seal), supra; United States v. Jones,
696 F.2d 1069 (4th Cir. 1982).

        In a more recent case in this district, Judge Davis

31

appeared to adopt a "primary purpose" test in evaluating whether a client contacted their attorney for legal rather than business advice.  Cohn, 303 F. Supp. 2d. 672.  An investment company and its general counsel were indicted for multiple counts of mail fraud and wire fraud in connection with their participation in a nationwide fraudulent consumer credit telemarketing program.  After the investment company had disclosed numerous documents pursuant to a grand jury subpoena, it moved during trial to bar the government from obtaining additional documents and testimony of a former in-house lawyer based on attorney-client privilege.  In its discussion, the court noted that privilege would not apply "to any communication 'as to which a business purpose would have served as a sufficient cause, i.e. any communications that would have been made because of a business purpose even if there had been no perceived additional interest in securing legal advice.'"  Id. at 684 (quoting McCaugherty v. Siffermann, 132 F.R.D. 234, 238 (N.D. Cal. 1990)).  In other words, the request for legal advice must be more than incidental to the business purpose; the primary purpose of the client's communication with the lawyer must be to obtain legal advice.  Id.; see also Carolina Power, 110 F.R.D. at 514.  Judge Davis's approach mirrors the narrower "but for" approach,

restating it in the converse: the communication will not be privileged if the client would not have made the communication but for a business purpose.      In sum, the Court concludes that the communication between a client and a lawyer must be for the purpose of requesting legal advice.  While not the sole purpose for such communication, it must be the primary purpose.[19]

A related inquiry is whether the advice sought and given is in the nature of business, as opposed to legal.  This is a particularly relevant inquiry here given the pervasive role that Mr. Steve Miller plays in the various Horejsi related entities.  He acknowledged (and the documents demonstrated) that he acts in officer or director capacities for the various entities, while also functioning like an "in-house counsel" to the entities and Mr. Horejsi himself.[20]  As a threshold matter,

---

[19] The Court recognizes the different, more expansive approach taken in the Restatement.  The Restatement states that a communication is privileged if it is made to a lawyer whom the client consults for the purpose of obtaining legal advice "and not predominantly for another purpose."  Rest. Law Governing Law.  § 72 cmt. c (2000).  This language is meant to be a deliberate rejection of the "predominant purpose" and is intended to "expand somewhat the communications subject to the privilege."  John K. Villa, 1 Corporate Counsel Guidelines § 1.16 (2005).

[20] "The fact that in-house counsel often plays multiple roles in the corporation has caused many courts to apply heightened scrutiny in determining whether the elements of the attorney-client privilege have been established.  While courts state that they do not intend to weaken the privilege, they are mindful that corporate clients could attempt to hide mountains of otherwise discoverable information

the attorney-client privilege applies to "in-house" counsel
just as it would to any other attorney.  See NLRB v. Sears,
Roebuck & Co., 421 U.S. 132, 154, 95 S.Ct. 1504, 44 L.Ed.2d 29
(1974).

But, the attorney-client privilege "applies only to
communications made to an attorney in his capacity as legal
advisor."  See Marten v. Yellow Freight System, Inc., 1998 WL
13244 *7 (D. Kan. Jan. 6, 1998).  Where business and legal
advice are intertwined, the legal advice must predominate for
the communication to be protected.  Coleman v. ABC, 106 F.R.D.
201, 206 (D.D.C. 1985); see also ABB Kent-Taylor v. Stallings
and Co., Inc., 172 F.R.D. 53, 55 (W.D.N.Y. 1996) ("[o]ften
intertwined with legal advice as to substantive issues is
counsel's strategic assessment of alternative choices of
action available to the client.").  In other words, "when the
legal advice is merely incidental to business advice, the
privilege does not apply."  Great Plains Mutual Insurance Co.

---

behind a veil of secrecy by using in-house legal departments as
conduits of otherwise unprivileged information.  As a result, many
courts impose a higher burden on in-house counsel to 'clearly
demonstrate' that advice was given in a legal capacity."  David M.
Greenwald et al., Testimonial Privileges § 1:44 (3d ed. 2005).  See
also  Rice, supra, § 7.29 and cases cited therein, ("Courts have held
that communications to and from in-house counsel can be sheltered
'only upon a clear showing that [in house counsel] gave [advice] in a
professional legal capacity.'") This Court has not applied any
heightened standard.  The defendants have failed to meet the
undisputed general standard set out in United Shoe.

v. Mutual Reinsurance Bureau, 150 F.R.D. 193, 197 (D. Kan.
1993).  Relatedly, "communications by a corporation with its
attorney, who at the time is acting solely in his capacity as
a business advisor, would not be privileged."  See Great
Plains, 150 F.R.D. at 197.

Gergacz, in his useful treatise, Attorney Corporate
Client Privilege, suggests that where an attorney has
multiple roles

> the focus of the inquiry should be on the function
> that the lawyer is predominantly performing:  Is he
> applying law to a set of facts, reviewing client
> conduct based on the effect of laws or regulations,
> advising the client about status or trends in the
> law, and other similar lawyer-related tasks.

§ 3.30.  See also Rice, supra, § 7:9 ("[T]he legal standard
[or definition of "legal advice"] requires that the lawyers'
services involve interpretation and application of legal
principles to specific facts in order to guide future conduct.
It requires an attorney to render the type of services that
his education and certification to practice qualify him to
render for compensation.  Legal assistance requires 'the
involvement of the judgment of a lawyer in his capacity as a
lawyer.'").  Defendants' sweeping reliance on the attorney
status of Mr. Miller, Mr. Stephens and others to shield all
communications is obviously out of sync with governing law.

Even if the advice communicated by defendants' counsel

35

were legal in nature, the attorney's communication must
contain the client's confidences in order to garner protection
under the attorney-client privilege.  It is established in the
Fourth Circuit that the privilege attaches not only to
communications by the client to the attorney, but to advice
from the attorney to the client. <u>(Under Seal)</u>, 748 F.2d at
874. Nevertheless, just as all communications from client to
attorney are not privileged, neither are all responsive
attorney communications privileged.  While courts agree that
the attorney-client privilege protects communications from the
attorney to the client, they have developed differing
approaches as to which communications may be protected.  The
narrow approach, espoused by the Fourth Circuit in <u>(Under</u>
<u>Seal)</u>, protects only those communications from attorney to
client that would reveal a confidential communication from the
client if disclosed.  <u>Accord</u> Rice, <u>Attorney-Client Privilege</u>
<u>in the United States</u> ¶ 6.4 (2d ed. 1999) ("The types of
information [in the attorney's response] protected by the
privilege are limited to information reasonably believed
necessary to the advice sought and for which there is a
reasonable expectation of confidentiality.")  This approach
contrasts with a broader view holding that the privilege will
protect a communication from attorney to client only if the

communication is based on a confidential communication from
the client to the attorney.  E.g., In re Sealed Case, 737 F.2d
94, 99 (D.C. Cir. 1984).  The broadest approach, set forth by
the Restatement (Third) of the Law Governing Lawyers, protects
all communications from the attorney to the client regardless
of their relationship to client communications. § 69 (2000).

In (Under Seal), the Fourth Circuit analyzed attorney-
client privilege in the context of documents subpoenaed during
a grand jury investigation.  The Court noted that "[b]ecause
the privilege protects the substance of communications, it may
also be extended to protect communications by the lawyer to
his client, agents or superiors . . . if those communications
reveal confidential client communications."  748 F.2d at 874.
In rejecting the claim of privilege, the court found that
numerous documents did not reveal client communications and
therefore would not be protected by the attorney-client
privilege.  Id. at 876-77; see also Republican Party of North
Carolina v. Martin, 136 F.R.D. 421, 426-427 (E.D.N.C. 1991);
Carolina Power, 110 F.R.D. at 514-15 (noting that memoranda or
briefs prepared for prosecuting a case that do not "reveal
information supplied in confidence by the client" are not
privileged.).  Thus, attorney-client communications are only
privileged to the extent that they reveal the substance of the

protected client communications.  However, a request for legal
advice in and of itself (without inclusion of factual
information) and responsive legal advice (again without
factual information) can be privileged as documents which
"reveal the motive of the client in seeking representation,
litigation strategy or the specific nature of the services
provided, such as researching particular areas of the law,
fall within the privilege." Chaudhry v. Gallerizzo, 174 F.3d
394, 402 (4th Cir. 1999); cert. denied, 528 U.S. 891 (1999).
See also In re Grand Jury Proceedings, 33 F.3d 342, 354 (4th
Cir. 1994) (noting the privilege will apply to bills revealing
something about the advice sought or given).

Even where the confidential communications of the client
are present, privilege will not apply when disclosure is
intended.  The defendants have asserted attorney-client
privilege over various drafts and accompanying communications
made in connection with the section 13D filing.  (Volume II of
the Withheld Documents.)  They similarly claim attorney-client
privilege over the drafts and communications for the tender
offer/offer to purchase, the letter sent by Horejsi to the NRL
Board of Directors on behalf of the Trusts, and the tombstone.
(See Documents in Vol. I & III.)  The Fourth Circuit has
rejected explicitly a blanket privilege for such drafts and

related communications, adopting an approach that focuses on the "requisite intent to publish." In re Grand Jury Subpoena, 204 F.3d 516, 521 (4th Cir. 2000).

The Fourth Circuit has held that the attorney-client privilege does not apply to information communicated by the client to the attorney with the understanding or intention that the communication was to be made known to others. In re Grand Jury Proceedings, 727 F.2d 1352, 1355-56 (4th Cir. 1984). In In re Grand Jury, the government subpoenaed an attorney to testify before a grand jury regarding conversations with his client made in connection with the preparation of a prospectus for a proposed private placement of limited partnership interests. The court held that the information given to the attorney was to assist in preparing the prospectus for viewing by other private investors, and was not intended to be kept confidential. Thus, attorney-client privilege did not apply. Id. at 1354.

Later, the Fourth Circuit refined its holding in (Under Seal), 748 F.2d at 875, based on the client's intent to publish. The court focused on the role of the attorney to determine whether confidentiality was intended, stating, "Rather than look to the existence of the attorney-client relationship or to the existence or absence of a specific

request for confidentiality, a court must look to the services which the attorney has been employed to provide, and determine if those services would reasonably be expected to entail the publication of the clients' communications." Id. at 875.  The court distinguished the case from In re Grand Jury, where the client had decided to publish a prospectus before approaching their attorneys, thus indicating that the attorney had been retained to convey information to third parties, not to provide legal advice for the client's guidance.  Id.  In (Under Seal), the client had retained an attorney to investigate the possibility of filing papers which, if filed, would be disclosed to third parties.  The court held that only when the client authorizes the attorney to perform services that demonstrate the client's intent to have his communications published will the client lose the right to assert the privilege as to the subject matter of those communications.  Id. at 876.

In In re Grand Jury Proceedings v. Under Seal, 33 F.3d 342 (4th Cir. 1994), the court reaffirmed this approach.  A subsidiary had refused to produce drafts of securities filings submitted to the Securities Exchange Commission ("SEC").  The court began its analysis by stating that privilege would not apply to communications in connection with a proposed public

disclosure:

> [I]f a client communicates information to his attorney
> with the understanding that the information will be
> revealed to others, that information as well as "the
> details underlying the data which was to be published"
> will not enjoy the privilege.

Id. at 354 (quoting (Under Seal), 748 F.2d at 875). Privilege

does not attach because "the disclosure of any significant

part of a communication waives the privilege and requires the

attorney to disclose the details underlying the data which was

to be published." Id. (internal quotations and citations

omitted). In reaching this conclusion, the Fourth Circuit

soundly rejected the approach set out in Schenet v. Anderson,

678 F.Supp. 1280 (E.D.Mich. 1988).[21] The court concluded that

the client could only prevail by demonstrating "that they did

not retain the services of the attorneys for the purpose of

advice on publication." Id. Because the SEC filings were

completed and filed, "that endeavor would be fruitless." Id.

In the most recent expression of the Fourth Circuit view

---

[21] Schenet held that privilege would apply to all information
conveyed by clients to their attorneys for the purpose of drafting
documents to be disclosed to third parties to the extent that such
information is not contained in the final published document. Id. at
1283. Schenet also held that preliminary drafts of documents
intended to be made public may be protected by the attorney-client
privilege, and that privilege is waived only as to those portions of
the drafts ultimately revealed to third parties. Id. at 1283-84.
The Fourth Circuit recognized the conflict between Schenet and its
own precedent, and therefore declined to adopt Schenet's reasoning.
Under Seal, 33 F.3d at 355.

on privilege and public disclosure, In re: Grand Jury
Subpoena, 341 F.3d 331 (4th Cir. 2003), the court reiterated
the client's intent to publish as the touchstone for
determining whether confidentiality was expected and whether
attorney-client privilege would attach.   The client had filed
a "green card" application with the Immigration and
Naturalization Service indicating that he had not been
previously arrested, cited, charged, or imprisoned for
breaking or violating any law or ordinance.   An FBI background
check revealed a previous shoplifting conviction.   When the
FBI questioned the client about his negative response to the
question about past crimes, the client indicated he answered
under the advice of an attorney. A grand jury subpoenaed the
client's counsel, who would not answer whether he advised his
client to answer "no" in response to the question about past
crimes.   The district court granted the government's motion to
compel on the basis of implicit waiver, but concluded that the
attorney-client privilege would have protected the advice
given by counsel to his client if not waived.   Id. at 334.
The Fourth Circuit agreed with the lower court and rejected
the government's argument that the client's disclosure on the
"green card" form makes privilege inapplicable.

    The court stated, "The underlying communications between

Counsel and [client] regarding his submission... are privileged, regardless of the fact that those communications may have assisted him in answering questions in a public document." <u>Id.</u> at 336.[22]  The court repeated its earlier holdings in <u>(Under Seal)</u> and <u>In re Grand Jury Proceedings</u> that the client must have intended his communications to be published in order to subject the communications to disclosure.  <u>Id.</u> (citing <u>(Under Seal)</u>, 748 F.2d at 875-76; <u>In</u>

---

[22]  The Fourth Circuit noted that the government's suggested approach "would lead to the untenable result that any attorney-client communications relating to the preparation of publicly filed legal documents--such as court pleadings--would be unprotected." <u>Id.</u>  At first glance, this statement appears contrary to previous Fourth Circuit precedent discussed <u>supra</u>.  However, the Fourth Circuit did not discuss whether it was limiting or altering the approach it had developed in <u>In re Grand Jury</u>, <u>(Under Seal)</u>, or <u>Under Seal</u>.  In fact, the Fourth Circuit affirmed its previous holdings in the subsequent paragraph.  Thus, the Court believes the dicta in <u>In re: Grand Jury Subpoena</u> applies privilege to communications when a client contacts an attorney for legal advice and not when a client intends to make a public disclosure and employs an attorney to do so.

The example provided by <u>(Under Seal)</u> continues to be instructive:

> ... a client may request his attorney to research the possibility of seeking a tax ruling from the Internal Revenue Service.  Research results and further consultation may convince the client that his chances of obtaining a favorable ruling are not great enough to justify publicizing his accounting practices or business plans.  The communications underlying the client's request for research must be considered confidential or else the client will be discouraged from fully informing his lawyer of his business practices when he seeks to discover whether those practices re or will be clearly legal, clearly illegal, or in the gray area....

748 F.2d at 876.  Communications are clearly protected when the client is seeking legal advice from the attorney, but not when the client employs the attorney with the intent of disclosing information to a third party.

<u>re Grand Jury</u>, 727 F.2d at 1358).  The client had not employed the attorney for purposes of publishing any information; he had consulted with the attorney for legal advice.

In light of the Fourth Circuit's approach, defendants' attempts to claim privilege for drafts of the section 13D filing are misguided.  Counsel was employed to convey information passed from the defendants to the SEC in the 13D filing.  To demonstrate otherwise would be fruitless.  <u>Under Seal</u>, 33 F.3d at 355.

Furthermore, the communications via E-mail that accompanied the drafts would not be privileged, as they constitute the details "underlying the published data" of the public disclosure.  The Fourth Circuit has described these details as including "the communications relating the data, the document, if any, to be published containing the data, all preliminary drafts of the document, and any attorney's notes containing material necessary to the preparation of the document."  (<u>Under Seal</u>), 748 F.2d at 875 n.7.  Further, any copies of other documents, "the content of which were necessary to the preparation of the published document," will not be privileged.  <u>Id.</u>  Therefore, all the drafts of the section 13D filing and accompanying underlying "details" found in Volume II are not privileged.

The same result follows for the drafts and related communications of other disclosed documents for which privilege has been asserted.  A public disclosure to a government agency is not required.  "Public" can also mean "public action", i.e. disclosure to any third party outside the attorney-client relationship.  See In re Grand Jury Subpoena, 204 F.3d 516, 522 (4th Cir. 2000) (concluding that no privilege existed where client, through his attorney, made disclosure via letter to another attorney).  "When a client hires an attorney to take public actions on the client's behalf-in this case, sending the letter to [the other attorney] in order to avoid a lawsuit-the privilege does not extend... once that public action is taken."  Id.

The tender offer/offer of purchase made to existing NRL shareholders falls within this meaning of public disclosure. The defendants certainly intended to publish the tender offer/offer of purchase in order to acquire NRL shares, and employed counsel to assist them in making the disclosure. Thus, the drafts of the tender offer and accompanying communications cannot be privileged.

Similarly, the tombstone, the notice of offer to purchase published in the newspaper, would not qualify for protection under the attorney-client privilege.  The intent to publish

the tombstone was a consequence of the defendant's tender offer for NRL shares.  Because counsel was "authorized to perform services that demonstrate the client's intent to have his communications published," (Under Seal), 748 F.2d at 876, the defendants have lost the right to assert privilege over drafts of the tombstone and any accompanying communications related to the tombstone.

Finally, defendants assert privilege over drafts and related communications of a letter sent by Stewart Horejsi to the NRL board of directors in connection with the tender offer.  The Court has greater difficulty assessing the intent to publish because language in one E-mail suggests that Mr. Horejsi may have been seeking legal advice about possibly sending the letter.  (Vol. I Tab 16, BTC00000731.)  However, the tone and content of other language suggests a decision to send the letter with only the details and logistics of the communication at issue.  (Id.)  In any event, the defendants have not defended their privilege by providing factual support by way of affidavit, letters, etc., that demonstrates Horejsi did not intend to publish this document and to employ counsel to assist him in conveying the information in the letter. Thus, the drafts and accompanying communications of the Horejsi letter to the NRL board are not privileged.

**2.  The "Common Interest" or "Joint Defense" Doctrine**

Not every disclosure of a privileged attorney-client communication, however, will waive the privilege.  The Fourth Circuit has recognized that "persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims" without waiving privileged attorney-client communications.  In re Grand Jury Proceedings 89-3 & 89-4, 902 F.2d 244, 249 (4th Cir. 1990).  This "joint defense" or "common interest" doctrine is an extension of the attorney-client privilege and "presupposes the existence of an otherwise valid privilege."  Id.

The joint defense or common interest doctrine has its origins in the criminal law, where multiple defendants, each having separate counsel, share information to effect a united defense.  The doctrine has, however, been extended to civil matters.  Id. at 248-249; Duplan Corp. v. Deering Milliken, 397 F. Supp. 1146, 1164 (D.S.C. 1974) ("The 'common interest' arrangement permits the disclosure of a privileged communication without waiving the privilege, provided the parties have "an identical legal interest with respect to the subject matter of the communication.")  While some courts have

found it unnecessary that there be actual litigation in progress for the privilege to apply, <u>see</u> <u>United States v. Schwimmer</u>, 892 F.2d 237, 244 (2d Cir. 1989), the purpose of the communication must be to assist parties in furthering a "common interest about a legal matter." <u>In re Grand Jury Subpoenas, 89-3 and 89-4</u>, 902 F.2d at 249.

The Fourth Circuit and most, but not all, courts require that the common interest must be legal in nature for the privilege to apply to any information shared among the parties. <u>U.S. v. Aramony</u>, 88 F.3d 1369, 1392 (4th Cir. 1996) ("To be entitled to the protection of this privilege, the parties must first share a common interest about a legal matter."); <u>Sheet Metal Workers v. Sweeney</u>, 29 F.3d 120, 124 (4th Cir. 1994); <u>Bank Brussels Lambert v. Credit Lyonnais</u>, 160 F.R.D. 437, 447 (S.D.N.Y. 1995) ("In theory, the parties among whom privileged matter is shared must have a common legal interest, as opposed to a commercial interest) . . . [T]he common interest doctrine does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation."); <u>Duplan Corp.</u>, 397 F. Supp. 1146.

"Moreover, [a] proponent of the joint defense/common interest privilege must establish that <u>when</u> communications were shared among individuals with common legal interests, the

48

act of sharing was part of an ongoing common legal enterprise." Rice, supra, § 4:37.  In determining the applicability of the privilege, the focus is "not on when [the] documents were generated, but on the circumstances surrounding the disclosure of [the] privileged documents to a jointly interested third party." Id.

Defendants make no attempt to "establish that when communications were shared among individuals with common legal interests, and that the act of sharing was part of an ongoing legal enterprise."  They rely blindly and boldly on the "affiliation of the various entities.  However, unless there is "common ownership or control," courts engage in a painstaking analysis to determine whether "the third party . . . shares an identical, and not merely similar, legal interest as the client with respect to the subject matter of the communication between the client and its attorney." Roberts v. Carrier Corp., 107 F.R.D. 678, 678-88 (N.D. Ind. 1985) (finding that the sister subsidiaries of a single parent corporation had identical common interest in defense of a product liability suit); Music Sales Corp. v. Morris, 1999 WL 974025 (S.D.N.Y. Oct. 26, 1999) (finding that communications between wholly owned subsidiaries privileged under common interest because corporations operated as a single entity.)

49

That type of "de jure" common ownership or complete control is patently not the case here.

However, as set out in the factual background, due to the defendant Trusts (undefined) ownership interest in BIA, SIA and FAS, they are financially interested in their business success, but there is neither a demonstrated controlling financial relationship nor any legal relationship. Similarly, while the LOLA Trust owns a 50% interest in BIA and FAS and thus all have similar interests in the profitability of BIA and FAS. This type of ownership interest does not establish a joint or common interest for purposes of privilege. Defendant Stewart Horejsi clearly has a personal and indirect financial interest in the funds doing well, as the Trusts have invested in them and he and his children are beneficiaries of the Trusts. Similarly, Mr. Horejsi has a business interest in the funds, as he receives remuneration as portfolio manager of BIA and SIA, which are the investment advisors to two of the funds. But these kinds of interests and relationships do not prevent waiver of attorney-client privilege when documents are shared beyond the client. Or said another way, these kinds of interests or relationships have not been found to establish an

50

entitlement to a joint defense or common interest privilege.[23]

Mr. Miller also argues that the common legal interest is seen by his concurrent representation of the multiple Horejsi entities and Mr. Horejsi himself.  The fact that several clients have the same lawyer does not, however, establish a common legal interest, extending the privilege.  Defendants claim that (in spite of the fact that no legal interest has been demonstrated) they share a common legal interest because of their various connections to each other and third parties,

---

[23] Many of the documents that the Trusts and Badlands scheduled on their privilege log as responsive to the requests (and notably not objected to an irrelevant) are not communications between or among these three defendants or are not documents directly involving either the Trusts or Badlands.

But the fact that the Trust and Badlands defendants had these presumptively attorney-client privileged documents in their files or were within their possession, custody or control means that the privilege presumptively enjoyed by the original attorney and client was not waived when shared with the Trusts and Badlands defendants.

The question of the maintenance of the attorney-client privilege when a document is circulated beyond the authors and addressees is, like all privilege questions, resolved only through a painstaking analysis, on a document-by-document basis, considering the context and circumstances.

The problem here, of course, is that there is apparently no meaningful operational distinction between and among the various Horejsi-related entities.  Information apparently is shared among the entities without regard to the fact that the entities are legally distinct.  All of these documents were in the possession, custody or control of the defendants, from the Bates-stamp, in the LOLA Trust or Badlands' files.  Defendants appear to believe that this arrangement thereby expands the notion of confidentiality and thereby the privilege.  While the various Horejsi related entities may have chosen to ignore their separate legal identities and share information across and among legally distinct entities, the law of privilege does not.

including their use of the same legal representatives.  The
Court disagrees.  Employing joint counsel may be evidence that
a common interest exists, but it does not create one, as
defendants would have the Court believe.  Although in certain
instances courts have used same counsel as <u>evidence</u> of a
common interest, it is certainly not dispositive.  "Concurrent
representation of two clients is not enough to make them joint
clients for purpose of the privilege.  The lawyer must be
'retained or consulted in common' on a matter of 'common
interest.'" David M. Greenwald, et al., <u>Testimonial Privileges</u>
§ 1:79 (3d ed. 2005).  As one court noted,

> Courts have found a community of interest where one
> party owes a duty to defend another, or where both
> consult the same attorney.  However, where the
> communication to a third party (non-party client) of
> an attorney-client exchange is not based on such a
> duty or direct transaction between the joint clients
> of an attorney (that is, a legal interest), <u>but is
> based rather on the non-party client's interest in a
> matter involving the prime client and some outsider,
> the reason for the exception to the normal rule of
> waiver ceases to exist, and with it, the exception</u>.

<u>Cheeves v. Southern Clays, Inc.</u>, 128 F.R.D. 128, 131 (D. Ga.
1989) (citing <u>Duplan Corp</u>, 397 F.Supp. at 1175) (emphasis
added).  <u>Cheeves</u> stands for the proposition that even when two
parties employ the same attorney and share information with
each other, if there is no common legal interest or fiduciary
duty, the doctrine does not apply.  Employing joint counsel

does not create a common legal interest, but is a consequence of that interest. Because no specific common interest with third parties has been proffered by defendants, it cannot be held that having joint counsel proves a common legal interest in this case. Essentially, the defendants argue that they share an ongoing common legal interest with all entities affiliated with them. The defendants do not attempt to demonstrate the commonality of their interest on a communication-by-communication basis. The cases do not recognize an ongoing common legal interest among "affiliated" but distinct individuals and entities, even when represented by the same counsel.

Accordingly, the Court did not assume, as defendants have argued, that the defendants' possession of privileged attorney-client communications involving other non-defendant but "affiliated" entities (either through Steve Miller's possession in his files or the maintenance of a single filing system for all Horejsi entities or however) did not waive the privilege. In the absence of defendants' demonstration that they shared a common legal interest with the holder of the privilege/the client in the subject matter of each particular communication, as the governing law demands, the documents in their possession have lost any privilege.

### 3.  Work Product Privilege

To qualify as work product, defendants must show that the documents were made "in anticipation of litigation or for trial."[24]  Fed.R.Civ.P. 26(b)(3).  If they were not made in anticipation of litigation, "the inquiry ends because the material is not protected."  <u>Sandberg v. Virginia Bankshires, Inc.</u>, 979 F.2d 332, 355 (4th Cir. 1992).

To determine the applicability of the work product doctrine, the court generally needs more than mere assertions by the party resisting discovery that documents or other tangible items were created in anticipation of litigation.  See <u>Pacific Employers Ins. Co. v. P.B. Hoidale Co., Inc.</u>, 142 F.R.D. 171, 173-74 (D. Kan. 1992).

The attorney must create the document "because of" the impending litigation.  Work product generally does not apply, unless the primary motivating purpose for creating the document is to assist in pending or impending litigation.  <u>Id.</u>  "To invoke the doctrine, a party must show that the document was prepared principally or exclusively to assist in

---

[24]For a document to be created "in anticipation of litigation" it must be "prepared *because* of the prospect of litigation when the preparer faces an actual claim following an actual event or series of events that reasonably could result in litigation."  <u>National Union Fire Ins. Co. v. Murray Sheet Metal Co.</u>, 967 F.2d 980, 984  (4th Cir. 1992).

anticipated or ongoing litigation." <u>Burton v. R.J. Reynolds</u>
<u>Tobacco Co.</u>, 170 F.R.D. 481, 485 (D. Kan. 1997), <u>reconsidered</u>
<u>in part</u>, 175 F.R.D. 321, (D. Kan. 1997).  The fact that
defendant anticipated litigation with plaintiff does not make
all documents thereafter "generated by or for its attorneys
subject to work product immunity.  A party claiming work
product immunity must still establish the underlying nexus
between the preparation of the document and the specific
litigation." <u>Burton</u>, 175 F.R.D. at 328.

The burden of showing that the withheld documents in this
case were prepared in anticipation of litigation rests with
the defendants. <u>Id.</u>  In meeting this burden, a party cannot
simply rely on conclusory statements in its memoranda.  4
James Wm. Moore, <u>Moore's Federal Practice</u> ¶ 26.15[2] (2nd ed.
1996).  Moreover, the Court will not speculate as to the
reasons the documents were created or construct a scenario
under which the documents could arguably be privileged.  Just
as in the case of the attorney-client privilege, the proponent
must provide specific factual support for its assertion.

The proponent of the work product doctrine must show that
he has not waived its protection. <u>United Shoe</u>, 89 F.Supp. at
359.  The defendants' failure to consistently assert the work
product privilege for the 256 documents for which the work

product privilege was asserted on the May 2 privilege log
waives the privilege of those documents.  <u>Mackey v. IBP, Inc.</u>,
167 F.R.D. 186 (D. Kan. 1996) (noting that the failure to
timely assert the privilege and failure to follow procedures
of Rule 26(b)(5) waived any claim of privilege); <u>Carey-Canada,
Inc. v. Aetna Cas. & Sur. Co.</u>, 118 F.R.D. 242, 248 (D.D.C.
1987) (noting that the failure to raise work product on
privilege log as alternative ground to attorney-client
privilege constituted a waiver of that privilege as to
disputed document); Gergacz, <u>supra</u>, § 3.09 n.4.

        In other factual situations, the Fourth Circuit has based
waiver of the privilege on a party's "conscious disregard of
the advantage provided by the privilege."  <u>See</u> <u>Black & Decker
v. U.S.</u>, 219 F.R.D. 87, 92 (D. Md. 2003); <u>Nutramax
Laboratories v. Twin Labs</u>, 183 F.R.D. 458, 462 (D. Md. 1998).
Defendants' deliberate withdrawal of the privilege assertion
from privilege logs notably in lieu of a response to
plaintiff's counsel's objections to the insufficiency of the
stated basis demonstrates a forfeiture of the privilege.  Any
other conclusion would wreak havoc with the orderly and
expeditious production of documents and the discovery process
as a whole and reward dilatoriness of counsel.

        In its <u>in</u> <u>camera</u> review, the Court has applied these

governing legal principles on a document-by-document basis in its rulings.

## II.

### Motion to Compel Production of Documents and Responses to Depositions Questions and Interrogatories

In this motion, plaintiff seeks an order compelling certain discovery:

(1) documents concerning the IRS audit of the dissolution of Horejsi and the communications of defendants or their counsel with the SEC;

(2) the identification that defense counsel had with Full Value Partners LP and its affiliated persons or representatives; and

(3) answers to deposition, questions of defendants' witnesses Horejsi and Miller to which they were improperly instructed not to answer.

For the reasons set forth below, the Court grants in part and denies in part this motion.

### IRS Audit Materials

The Court grants plaintiff's motion to compel the production of documents concerning the IRS audit of the dissolution of Horejsi, Inc.  The plaintiff has clearly and cogently demonstrated to the Court the relevance of this information to its argument under section 12(d) of the 1940 Act.  From what is known about the IRS audit, it appears that the IRS investigated the relationship between the various

Horejsi entities and concluded that Horejsi entities acted (or were capable of acting) in a collective fashion so that the stock at issue could be controlled and negotiated as a bloc, thereby deserving of a "premium" value.  This discovery thus may prove highly probative of NRL's "assert[ion] that the Horejsi family of interrelated trusts and affiliated companies should be considered a single investment company under the Investment Act of 1940 and therefore bound by the provisions of section 12(d)(1) of the Act that prohibit 'any investment company' from acquiring more than 3% of the stock of a registered investment company like NRL." (Paper No. 112 at 3.)

The defendants' arguments that none of plaintiff's requests for documents cover such audit documents and that the request represents a new and untimely document request are unavailing.  First, the Court concludes that request 18 of the First Requests for Production of Documents fairly elicits the IRS audit documents, and, second, that the defendants' failure to timely respond to this request disadvantaged plaintiff in making a more pointed request in its Second Request for Production of Documents as the document production revealing the IRS audit did not occur until after the Second Request was filed.  In any event, plaintiff specifically requested the

audit documents in advance of fact discovery deadline.
Defendants shall produce these IRS audit documents at the
offices of plaintiff's counsel by July 1, 2005.[25]

### Defendants' Communications with the SEC re NRL and Tender Offer and 1999 Exemption

In a letter dated April 29, 2005, plaintiff's counsel
acknowledges that defendants belatedly produced documentation
of communications between defendants and the SEC, specifically
emails, but that the production was patently incomplete as it
did not include any of the attachments to those emails.  The
defendants shall produce those attachments to the emails by
July 1, 2005.

There was no basis in law for withholding these
communications with the SEC.  In support of its work product
assertion, defendants cite a single case, U.S. v. AT&T, 642
F.2d 1285, 1299 (D.C. Cir. 1980).  That case may provide some
shelter for the withholding of defense attorney communications
with the counsel of Full Partners; however, it provides no
basis for withholding the SEC communications at issue here.

---

[25] The Court shall not attempt to identify all responsive
documents, but only note that the production shall include the
memorandum that "summarized the IRS' position" referred to in the
Badlands minutes of November 20, 2002 (LOLA 09851) and other
documents of communications between the IRS and the Horejsi entities
relating to the audit, that plaintiff states are referred to in
minutes of the Badlands' directors meetings.  (See Paper No. 99 at
1.)

Plaintiff cites plenary authority that any work product privilege was waived when shared with a governmental agency, particularly, but not exclusively, to induce agency action against the correspondent's adversary.  (See Paper No. 112 at 6-7 and cases cited therein.)  Accordingly, the defendants improperly withheld the recent SEC documents.

As to the earlier SEC communications dealing with Horejsi's 1999 exemption, defendants offer no basis for withholding the documents, but simply assert that the documents do not exist.  "As defendants stated, they are not aware of any written communication, other than the July 1999 minutes themselves, which embody any such communication". (Paper No. 109 at 2-3.)  The Court does not find such a position credible given the importance of this issue to the Horejsi entities.  The footnote in the minutes (LOLA 1681) refers to "SEC's staff identifi[cation of] Section 12(D) as a potential problem but chose to take no action when the company explained that it was 'grandfathered.'" In his letter of March 11, 2005, plaintiff's counsel, Daniel M. Perry, very appropriately asked defense counsel to "[p]lease confirm in writing that defendants have searched for all such communications held by defendants' agents, employees, representatives, affiliates, accountants, investigators, or by

60

defendants' attorneys or their agents, employees, representatives or investigators.  If documents reflecting those communications no longer exist, you should inform us and state the circumstances surround the destruction of such documents."  (Paper No. 99 Perry Decl. Ex. N).  Defendants refused.

By July 8, 2005, the defendants shall submit an affidavit of Stephen E. Miller detailing all of his efforts to locate these documents, including but not limited to all persons contacted (with title and contact information) and offices/files reviewed.  Mr. Miller shall include the substance of his contacts with Ann Hartman and John S. Horejsi, board members at the time and Thomas Stephens, Horejsi's entities' securities lawyers in Denver at the time and their efforts to locate the documents at issue.  Of course, a party does not discharge its duty by research and review of solely its own files, but is bound to investigate documents within the control of its agents, employees, attorneys, etc.

**Communications Between Defense Counsel and
Counsel for Plaintiff in Related Action - Full Value
(filed at time of declaratory judgment consideration)**

In its interrogatory no. 4, plaintiff asked the defendants to identify any communications between them and

Full Value.  Defendants refused claiming "attorney-client privilege, work product privilege or other privileges," but neither identified the purportedly privileged documents nor explained how they were privileged.[26]  By this utter failure, the defendants clearly forfeited any privilege they might have had.  Defendants simply declare that "[a]ll communication is in the manner of counsel to counsel and would be _prima_ _facie_ work product," (Paper No. 109 at 3), but fail to cite any authority for this proposition of law.  Under the banner of U.S. v. AT&T, 642 F.2d 1285, 1299 (D.C. Cir. 1980), an argument could be made in some circumstances for the preservation of the work product where there are "common interests between transferor and transferee;" here, however, defendants did not make such an argument, much less provide factual support for its applicability.  Moreover, plaintiff suggests that the interests of Full Value and defendants are not common as the Full Value plaintiff charges that the Horejsi Tender offer that was made is inadequate.  (Paper No. 112 at 8).  Accordingly, the Court grants the motion to compel an answer to interrogatory no. 4 by July 1.

### The Failure to Answer Deposition Questions by Defendants' Witnesses Horejsi and Miller

---

[26] The terms of the request eliminated any documents deserving of an attorney-client privilege.

In the present case the plaintiff claims that the defendants' counsel improperly asserted the attorney-client privilege and work-product doctrine when instructing his clients, Stewart Horejsi and Stephen Miller, not to answer numerous deposition questions. The Court will consider in turn the subject matter of the questions at issue, but first will discuss the appropriateness of instructing a witness to not answer a deposition question.

Federal Rule of Civil Procedure 30 governs the deposition process. A party or other witness may be questioned about any matter that is relevant to the litigation, which is not privileged, and the fact that the information sought may not ultimately be admissible does not mean that it is not discoverable. Fed. R. Civ. P. 26(b)(1).

During a deposition, a defending attorney may object from time to time based on relevance, form of the question, etc. but the deponent must answer the question, as no judge is present to rule on the objection. Counsel should not instruct the deponent to not answer except in very limited circumstances because of the disruption it causes. Fed. R. Civ. P. 30 advisory committee notes ("Directions to a deponent not to answer a question can be even more disruptive than objections."). The Fourth Circuit has recognized for over

twenty-five years that lawyers may instruct witnesses not to
answer questions during a deposition unless to assert a
privilege.  Ralston Purina Co. v. McFarland, 550 F.2d 967 (4th
Cir. 1977).  The 1993 amendments to the Federal Rules of Civil
Procedure codified the rule articulated in Ralston Purina.
Rule 30(d)(1) states:

> Any objection during a deposition must be stated
> concisely and in a non-argumentative and non-
> suggestive manner.  A person may instruct a deponent
> not to answer only when necessary to preserve a
> privilege, to enforce a limitation directed by the
> court, or to present a motion under Rule 30(d)(4).

Fed. R. Civ. P. 30(d)(1).  The Court has adopted Discovery
Guidelines, appended to the Local Rules, elaborating on the
propriety of instructing a witness to not answer a deposition
question.  Guideline 5 specifically controls the issue
relevant to this case, namely deposition questioning,
objections and procedure.  Guideline 5(d) provides that "[i]t
is presumptively improper to instruct a witness not to answer
a question during the taking of a deposition unless under the
circumstances permitted by Fed. R. Civ. P. 30(d)(1)."  Where
the basis of the instruction not to answer was the belief by
objecting counsel that the response included privileged
information, such an assertion of privilege should be
sufficient.

Guideline 6 indicates that "the person asserting the

privilege shall identify during the deposition the nature of
the privilege (including work product) that is being claimed"
as required by Fed. R. Civ. P. 26(b)(5).  Next, "the person
seeking disclosure shall have reasonable latitude during the
deposition to question the witness to establish other relevant
information concerning the assertion of privilege . . .," but
the asserting party need not reveal the privileged information
itself.  Guideline 6(a)(ii).[27]  Obviously, if privilege is
asserted as a reason to not answer, it must be a recognized
privilege.  7 Moore's Federal Practice § 30.43[2] (3d ed.
2005).  If the reason put forward is improper, the court may
order that the witness be re-deposed.  Id.  (citing Pilates,
Inc. v. Georgetown Bodyworks Deep Muscle Massage Ctrs., Inc.,
201 F.R.D. 261, 262 (D.D.C. 2000)).

Although reasonably straightforward, the difficulty
arises in determining which party bears the burden after the
witness has been instructed not to answer and the privilege

---

[27] After a claim of privilege has been asserted, the person
seeking disclosure may inquire as to: (i) the applicability of the
particular privilege being asserted; (ii) any circumstances which may
constitute an exception to the assertion of the privilege; (iii) any
circumstances which may result in the privilege having been waived;
and (iv) any circumstances that may overcome a claim of qualified
privilege.  In accordance with Fed. R. Civ. P. 26(b)(5), the party
asserting the privilege, in providing the foregoing information,
shall not be required to reveal the information which is itself
privileged or protected from disclosure.

has been asserted.   Several courts have held that the deponent

has the absolute duty to move for a protective order.

McDonough v. Keniston, 188 F.R.D. 22, 24 (D.N.H. 1988); Wilson

v. Martin Cty. Hosp. Dist., 149 F.R.D. 553, 555 (W.D. Tex.

1993).   On the other hand, "Rule 37(a)(2)(B) specifically

contemplates a motion to compel when a deponent refuses to

answer a question, thus suggesting that it is acceptable for

the witness to decline to answer and then wait to defend such

a motion."   Moore's Federal Practice, supra.   Although the

Fourth Circuit has not spoken on the issue, and there is no

clear majority approach, the latter seems to be the correct

approach.   As one commentator has noted,

> [T]he better course is to require the party who
> seeks to overcome a colorable claim of privilege to
> attach the assertion of privilege via a motion to
> compel testimony . . . a colorable good faith
> assertion of privilege, even if ultimately rejected
> by the court, is different [from an improper
> objection]: the privilege objection must be made to
> avoid waiver; it implicates substantive rights of
> the party apart from the litigation; and it serves
> to prevent depositions from becoming tools for
> abuse.   Consequently, the attorney who properly
> interposes a privilege objection should be able to
> rest on the objection without shouldering the burden
> of moving for a protective order.

Moore's Federal Practice, supra.   In any event, "little

functional difference [exists] between the two courses of

action, since in both cases the party resisting discovery has

the burden of supporting its position...."   Riddell Sports,

<u>Inc. v. Brooks</u>, 158 F.R.D. 555, 558 (S.D.N.Y. 1994) (citations omitted).

**The Instructions Not to Answer Plaintiff's Deposition Questions**

Overall, defendants' assertions of attorney-client privilege and work-product doctrine are without basis. Defendants suggest that plaintiff "cannot inquire as to the mental impressions of the Horejsi entities' lawyer with regard to legal issues." (Paper No. 109 at 7.)  Further, defendants state that "mental impressions" created while Miller performed work for the Horejsi entities "are part and parcel with the attorney-client privilege.  These questions violate both the attorney-client privilege and work product doctrine." (<u>Id.</u> at 11.)  Indeed, some of Miller's work for the related Horejsi entities may have been legal in nature; however, everything produced by Miller is not automatically protected because he is a lawyer.

Generally, a lawyer must be acting as a lawyer when communicating with the corporate client for the protection of the attorney-client privilege to apply.  Gergacz, <u>supra</u>, § 3.17.  First, as discussed earlier, if it is established that Mr. Miller has a business role he can be questioned freely unless attorney client privilege applies, that is, he is

asking for advice of counsel and that inquiry includes confidential facts or is recounting legal advice provided to him.

Second, even if Mr. Miller has no apparent business role (_i.e._, does not hold an officer position in the entity which activities are under examination and he asserts he is counsel to that entity), there is no presumption that all communications he has are privileged.  The communications are not privileged "merely because one of the parties is an attorney or because an attorney was present when the communications were made."  U.S. v. Cohn, 303 F.Supp.2d 672, 683 (D.Md. 2003) (citing Neuder v. Battelle Pacific Northwest National Laboratory, 194 F.R.D. 289, 293 (D.D.C. 2000)).  Rather, the Court will determine whether the communications were made primarily for the purpose of providing legal services by considering the context in which the communications were made.  Id. at 684.

### Actions of a Lawyer in a Business Capacity
### Do Not Qualify for Attorney-Client or Work Product Protection

Here the Court cannot conclude that Miller was acting as a lawyer or providing legal advice in the majority of situations where privilege was asserted during his deposition.  First, Miller did not answer questions about documents he

signed as an officer of Badlands Trust Company.  (Paper No. 99
Ex. K, Tr. 146:18-149:21.)  When an individual acts in a dual
capacity, but executes business documents in his capacity as a
businessperson, privilege does not apply.  Cohn, 303 F.Supp.2d
at 683-84.  The fact that Miller drafted these documents is
not determinative in light of his signing of the documents as
secretary of Badlands.  He must answer questions about the
meaning of the documents including the Master Consulting
Agreement and Cash Management Agreement.  The plaintiff's
inquiry about these documents may not be blocked merely by
defendants' assertion that Miller serves as counsel to the
various entities.

Similarly, Miller claims that he prepared minutes from a
July 31, 1999 meeting in his capacity as general counsel to
Horejsi, Inc., but signed the minutes as secretary.  (Paper
No. 99 Ex. K, Tr. 148:7-17; Ex. O.)  Miller not only signed
the minutes as a nonlegal business executive, but was noted as
serving as secretary during the course of the meeting.  (Id.
Ex. O.)  In this context, Miller was not acting in his role of
a lawyer, and attorney-client privilege would not attach.
Therefore, Miller should have answered all deposition
questions regarding the July 31, 1999 meeting because the
defendants have failed to establish Miller was acting as a

lawyer rather than as a business person.

Finally, even though Miller may have been acting as a lawyer when submitting declarations to the Court, he cannot resist answering questions related to the declaration based on privilege.  Although plaintiff stipulated that attorney-client privilege would not be waived, defendants still objected to Miller answering questions about his use of the words "Horejsi affiliates" in a declaration submitted to the Court.  (Paper No. 99 Ex. K, Tr. 58:13-59:11, 61:11-69:13, 67:20-70:3.)  By virtue of making this factual declaration, Miller must answer questions related to how he understood the use of the term.  An instruction not to answer based on privilege is wholly unfounded.

### Mental Impressions Alone Do Not Qualify for Attorney-Client Privilege or Work Product Doctrine

Plaintiff also argues that the deposition questions propounded to Stewart Horejsi and Stephen Miller about the employment arrangements between Miller and the funds and between Miller and the other Horejsi entities were proper and should have been answered.  The Court agrees.  The defendant's characterization of the questions as requiring a disclosure of Miller's mental impressions does not substantiate the assertion of either attorney-client privilege or work-product

70

doctrine.

In fact, defendants' counsel appears to have conflated the two separate protections at the deposition and in the opposition to the motion to compel.  For example, plaintiff's counsel asked whether Miller thought it was necessary to disclose the amount of time he worked on matters for the trusts and related Horejsi entities to the fund directors. (Paper No. 99 Ex. K, Tr. 43:15-22.)  Defendants' counsel objected on the basis that such an answer would reveal Miller's mental impressions as counsel to FAS, the Horejsi entities, and the funds.  (Id. at 45:7-22.)

A mental impression on its own is not a cognizable communication within the purview of the attorney-client privilege.  The privilege protects confidential communications between a client and an attorney for the purpose of obtaining legal advice.  Black & Decker Corp. v. U.S., 219 F.R.D. 87, 90 (D. Md. 2003).  Miller's negotiation of his compensation with the funds and other entities does not relate to the provision of legal advice.  See In re Grand Jury Proceedings, 33 F.3d 342, 354 (4th Cir. 1994) (noting that disclosure of billing and fee arrangement information would not necessarily reveal confidential communications).

Furthermore, there is no possibility of a work product

claim with respect to the answers to these questions.  Mental impressions by themselves do not qualify for protections under the work product doctrine.  Such impressions must be related to specific litigation, actual or anticipated.  Fed. R. Civ. P. 26(b)(3); In re Allen, 106 F.3d 582, 607 (4th Cir. 1997). The facts surrounding the employment commitment of Miller to the trusts, entities, and funds, and whether he disclosed the extent of those commitments, do not relate to mental impressions created by Miller in anticipation of litigation.

Thus, the objections and instructions not to answer were improper because the attorney-client privilege and work product doctrine do not apply to these mental impressions. The plaintiff may re-depose Miller and are entitled to responses to the questions relating to how he structured his employment arrangements and whether he disclosed this information to the investment companies.

The same result applies to the questions about the disclosure of the business purpose of various Horejsi entities.  Plaintiff asked Miller about the business purpose of Evergreen Atlantic LLC and the reasons for the creation of BIA and SIA.  (Paper No. 99 Ex. K., Tr. 14:7-8, 153:5-15.) Miller was again instructed by defendants' counsel not to answer.  These instructions were improper, too, because the

72

answers would not reveal information protected by either the work product doctrine or the attorney-client privilege.

**Communications Made in the Presence of Third Parties**

Plaintiff argues that the attorney-client privilege was waived in two separate instances because of the presence of third parties at the time the communications were made. First, Horejsi was instructed not to answer questions as to communications made during an October 15, 2004 meeting of the Board of Directors of First Financial Fund ("FFF"), a closed-end investment company controlled by the Horejsi entities. (Paper No. 99 Ex. P, Tr.114:16-117:15.)  Present at the meeting were Horejsi, Miller, John Ciciora (Horejsi's son-in-law), the FFF board members, and counsel to FFF.  From the testimony, it is unclear whether legal advice was given to FFF or to Horejsi himself.  If advice was given to FFF, then Mr. Ciciora would be a third party; if the advice was given to Horejsi, then the FFF board members and their counsel would be third parties.  In either instance, the presence of third parties at the time of the communication waived any privilege that may have existed.  See In re Allen, 106 F.3d 582, 600 (4th Cir. 1997) (listing elements for communication to be protected by the attorney-client privilege including that it must be made "without the presence of strangers").

73

Second, Miller was instructed not to answer questions about communications made at the November 15, 2004 Badlands board meeting.  (Paper No. 99 Ex. K, Tr.187:24-190:8). Present at the meeting were a certified public accountant unaffiliated with Badlands and an employee of FAS.  Their presence as third parties vitiates any privilege that may have attached to confidential communications and/or legal advice provided at the meeting.  It at all times remains the burden of the resisting party to demonstrate that the demanding requests of attorney client and work product are met.  Rather than defending the privilege they assert, defendants merely claim that the plaintiffs waived privilege by having third parties present at NRL board meetings.  (Paper No. 109 at 11.) In this respect, defendants have failed to meet their burden in demonstrating that privilege was not waived by the presence of third parties at a Badlands board meeting.

Accordingly, the defendants are ordered to produce Messrs. Miller and Horejsi by July 15, 2005, to answer these properly posed questions and any questions related to documents ordered to be produced.

### Rule 37(a)(4) Expenses

Fed. R. Civ. P. 37(a)(4) directs courts to award a successful moving party reasonable expenses incurred in making

its motion unless the Court finds that the motion was filed without the movant's first making a good faith effort to obtain the discovery without court action, or that the opposing party's position was "substantially justified" or that other circumstances make an award of expenses "unjust." If, as here, the motion was granted in part and denied in part, the Court should apportion the incurred expenses in relation to the rulings in a "just manner."

As set forth in the memorandum opinion, the Court found many of defendants' discovery positions lacking "substantial justifi[cation]."  For example, defendants' withholding of documents as privileged and instructions not to answer certain deposition questions disregard the narrow construction given the attorney-client privilege in the Fourth Circuit, as well as other established law on work product.  As a result, but subject to defendants' right to a hearing, the Court intends to impose on defendants and their counsel reasonable expenses, including attorneys' fees associated with the filing and litigation of the two motions to compel.[28]  Accordingly, the plaintiff's counsel shall submit an affidavit documenting its attorneys' fees and expenses incurred in filing and litigating

---

[28] The Court shall reduce the award as appropriate in light of the unsuccessful aspects of the motions.

the motions to compel, including contemporaneous billing

records by July 8, 2005.  Defendants shall have until July 22,

2005, to respond and to request a hearing.


Date: 6/23/05                          /s/

                              Susan K. Gauvey
                              United States Magistrate Judge