IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NEUBERGER BERMAN REAL :
ESTATE INCOME FUND, INC., :
    Plaintiff :
     :
    v. :     Civil No. AMD 04-3056
     :
LOLA BROWN TRUST NO. 1B, et al., :
    Defendants :
                    ...o0o...

MEMORANDUM OPINION

This action arises out of a hostile tender offer which sought to take control of a Maryland closed-end investment company; the lawsuit was one among several defensive actions taken in response to the tender offer by the investment company's board.[1] Three of the defendants filed a ten-count counterclaim, challenging, on myriad grounds, the propriety of the defensive measures invoked by plaintiff.[2] After discovery concluded, the parties filed cross-motions for summary judgment. A hearing was held and, by orders entered on March 30, 2007, and April 15, 2007, I granted in part and denied in part the cross-motions, and I filed an interlocutory declaratory judgment order announcing particular rulings and conclusions. This opinion spells out the reasons for those orders.

---

[1]Plaintiff alleges in its amended complaint that the tender offerors and others affiliated with, acting in concert with, and having control over, the tender offerors, made false, misleading, and incomplete disclosures in connection with the tender offer, and therefore seeks to enjoin the tender offerors pursuant to sections 14(e) and 20(a) of the Exchange Act, as amended, 15 U.S.C. §§ 78n(e) and 78t.

[2]The counterclaims seek declaratory and injunctive relief, and assert that all of the defensive measures invoked by the plaintiff violate one or more provisions under Maryland statutory and common law, and/or federal law and regulations. The sole damages claim is a claim for tortious interference with prospective business.

I.

A detailed account of the genesis and progress of this litigation may be found in the prior opinions issued in this case, familiarity with which is assumed. *See* 342 F.Supp.2d 371 (D.Md. 2004)(denying motion for preliminary injunction); 225 F.R.D. 171 (D.Md. 2004) (certifying declaratory judgment for immediate appeal); 230 F.R.D. 398 (D.Md. 2005) (resolving discovery disputes and ordering sanctions against defendants under Fed.R.Civ.P. 37); 2006 WL 709846 (D.Md., March 20, 2006) (overruling exceptions to magistrate judge's determinations of discovery disputes and imposition of sanctions). *See also Full Value Partners, L.P. v. Neuberger Berman Real Estate Income Fund, Inc.,* 2005 WL 885421 (D.Md., April 18, 2005)(parallel litigation instituted by a shareholder of plaintiff).

In summary, plaintiff Neuberger Berman Real Estate Income Fund, Inc. (" NRL"), is a closed-end investment company incorporated in Maryland, investing primarily in real estate securities. NRL is subject to the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 *et seq.* (the "ICA" or "the 1940 Act"). NRL's common stock trades on the New York Stock Exchange. Neuberger Berman Management, Inc. (NBM) acts as the investment adviser to NRL; Neuberger Berman, LLC ("NBLLC") is the sub-adviser.

Six defendants are joined in the two-count amended complaint. Defendants Lola Brown Trust No. 1B ("Lola Trust") and Ernest Horejsi Trust No. 1B ("Ernest Trust") are irrevocable grantor trusts domiciled and administered in South Dakota. Defendant Stewart R. Horejsi ("Horejsi") is a beneficiary (and one-time trustee) of the trusts, an active private

investor and a portfolio manager for Boulder Investment Advisors ("BIA") and Stewart Investment Advisors ("SIA"), two non-party investment companies. The remaining defendants are sued in their capacity as trustees of the trusts: (1) Badlands Trust Company ("Badlands"); (2) Susan L. Ciciora (the daughter of defendant Horejsi, who is also a beneficiary of one or more related trusts); and (3) Larry L. Dunlap.

In September 2004, Horejsi, the Lola Trust, and the Ernest Trust jointly filed a Schedule 13D with the Securities and Exchange Commission ("SEC") disclosing that the trusts had acquired approximately 10.05% of the outstanding shares of NRL and that they intended to acquire just over 50% of the outstanding shares of NRL, with the intent to change or expand the investment objectives of the NRL, to replace NRL's directors, to replace the NRL's investment adviser with BIA and SIA, and to replace the administrator with an affiliate of defendants. Accordingly, on September 10, 2004, the two trusts commenced a partial tender offer to purchase for cash up to 1,825,000 outstanding shares of common stock of NRL, so as to acquire up to 50.01% of NRL's outstanding shares. The Schedule TO filed with the SEC indicated that the trusts had acquired an additional 8,000 shares of NRL common stock beyond that disclosed on September 2, 2004, such that the two trusts collectively owned approximately 10.22% of the outstanding shares. The offer and corresponding withdrawal rights were to expire at midnight on October 8, 2004. On October 4, 2004, the offerors extended the expiration date to midnight on October 15, 2004.

As detailed in my prior opinion, NRL's board ultimately adopted the recommendation

of its special committee of independent directors to recommend to shareholders that they not tender and that the board oppose the tender offer by taking a series of defensive measures to thwart it. The board took the following actions: (1) it signed a "Common Stock Purchase Agreement," pursuant to which plaintiff issued 139,535 unregistered shares of NRL common stock to NBLLC for $21.50 per share, a price equal to NRL's net asset value and higher than the market price, thereby diluting the offerors' interest to 9.92% of NRL's voting shares; (2) it adopted a resolution, effective immediately after the issuance of the shares to NBLLC, electing NRL to be subject to the Maryland Control Share Acquisition Act ("MCSAA"), thereby limiting the voting rights of any shareholder who acquires "control shares" (greater than 10%), i.e., requires such a shareholder to obtain the approval of two-thirds of the other, disinterested shareholders, to vote the "control shares;" (3) it adopted a "Rights Agreement" or "poison pill," pursuant to which a tender offeror's purchase of more than 11% of outstanding shares would effect a fatal dilution of the tender offeror's shares; (4) it authorized the commencement of a self tender offer for 943,704 shares of common stock at a price of $20.00 per share, a price below the net asset value per share but higher than the price ($19.89) of the hostile offerors; and (5) it commenced this lawsuit.

Defendants filed counterclaims and, after a hearing on defendants' motion for preliminary injunction, I issued an opinion and order denying the motion for preliminary injunction, concluding that the poison pill was validly adopted. *See* 342 F.Supp.2d 371 (D.Md. 2004). Although defendants did not note an appeal from the denial of the motion for

preliminary injunction as they could have, they moved for an order certifying my declaratory judgment order as immediately appealable. Accepting defendants' representation at the hearing that the tender offer would be abandoned if the court's ruling on the validity of the poison pill were upheld, I certified the order as immediately appealable under Fed.R.Civ.P. 54. The Fourth Circuit promptly granted plaintiff/appellee's motion to dismiss the appeal, however, and the case returned to this court for a period of highly contentious discovery. In the meantime, during the pendency of this case, the Ernest Trust withdrew as a tender offeror (leaving only the Lola Trust as the offeror) and NRL has adopted a series of poison pills, such that NRL has had a poison pill in effect every day since September 23, 2004.

The Lola Trust's tender offer has been extended to, and the most recent poison pill has likewise been extended to, Summer 2007. (A proposal has been put forward to liquidate the fund, which is scheduled for consideration at a special meeting of stockholders in July 2007.)

II.

The parties sought summary judgment on plaintiff's affirmative defense, asserted under §12(d) of the ICA, 15 U.S.C.§ 80a-12(d)(1)(A)(i), to all of the counterclaims. I agree that, as a matter of law, defendants are entitled to judgment on the § 12(d) affirmative defense.

Section 12(d) of the ICA prohibits an investment company from acquiring more than three percent of the outstanding voting stock of any registered investment company. 15

U.S.C. §80a-12(d)(1)(A)(i).[3] Describing defendants and their related entities, most prominently the numerous family trusts, as a "Family Investment Company" under the rubric of the "Horejsi Group," and drawing heavily on the history of the so-called Horejsi Group's successful efforts to gain control of three closed-end investment companies in the 1990s through tender offers, NRL asserted that both the Horejsi Group, and, separately, the Lola Trust, is an "investment company" and that their ownership of more than three percent of the voting stock of NRL is prohibited by §12(d). Defendants contend that there is no such thing in fact or in law as "the Horejsi Group" and that the Lola Trust is not an investment company for any one or more of a host of reasons.[4]

---

[3] 15 U.S.C. § 80a-12(d)(1)(A) reads in pertinent part as follows:
>    It shall be unlawful for any registered investment company (the "acquiring company") and any company or companies controlled by such acquiring company to purchase or otherwise acquire any security issued by any other investment company (the "acquired company"), and for any investment company (the "acquiring company") and any company or companies controlled by such acquiring company to purchase or otherwise acquire any security issued by any registered investment company (the "acquired company"), if the acquiring company and any company or companies controlled by it immediately after such acquisition own the aggregate-
>    (i) more than 3 per centum of the total outstanding voting stock of the acquired company . . .

[4] NRL develops at great length an elaborate argument designed to demonstrate how the "Horejsi Group" fits within the concept of an "investment company."
   NRL argues that the "Horejsi Group's" principal business is investing in securities through a pooling of its formidable assets; that its declared intention to obtain control of certain closed-end investment companies constitutes a "scheme" or "common enterprise" within the meaning of the IAC; that the "Horejsi Group" is an "issuer" because it operates through the execution and implementation of "investment contracts" (comprised of management and advisor agreements with Horejsi and entities he controls, as well as the trusts' membership interests in certain limited liability companies) and that one of the revenue sources for the "Horejsi Group"
(continued...)

An investment company is defined in §3(a)(1) of the IC as "any issuer which . . . is or holds itself out to being engaged primarily . . . in the business of investing, reinvesting, or trading in securities." 15 U.S.C. § 80a-3. In §2(a)(28) a "company" is defined to include "any organized group of person whether incorporated or not." 15 U.S.C. § 80a-2(a)(28). Section 2(a)(22) of the IAC defines an issuer to include "every person who issues or proposes to issue any security." 15 U.S.C. § 80a-2(a)(22). A security is defined to include "any . . . investment contract." 15 U.S.C. § 77(b)(a)(1).

The term "investment contract" has been interpreted by the Supreme Court to include those instruments that, although not specifically named in the securities statutes, function as securities and thus require regulation. Specifically, the Supreme Court held, in *SEC v. Howey*, 328 U.S. 293, 298-99 (1946), that the term "investment contract" (under federal securities laws) "means a contract, transaction or scheme whereby a person invests his

---

[4](...continued)
is the replacement of existing investment management and administration contracts to which the target closed-end investment companies are parties with such companies that are controlled by the "Horejsi Group" and Horejsi. Furthermore, NRL contends that because the Lola Trust (like all the Horejsi Trusts) is a constituent element of the overall "Horejsi Group" under the IAC, it alone is bound by the percentage ownership prohibition of §12(d) every bit as much as is the "Horejsi Group" as a whole.

Defendants argue, *inter alia*, that there is no cognizable "pooling" of funds, that the non-existent "Horejsi Group" "issues" no "securities," and that, at best, Horejsi is an "employee" of the trusts, including the Lola Trust, and that the entire imaginary "Horejsi Group" is, at best, a general partnership. The trusts concede that Horejsi provides investment advice to all the trusts and that the trustees in fact follow his advice routinely, but assert that at no point do the trusts in fact pool their funds, engage in a "common enterprise" or rely on "the efforts of others." The trusts assert that each of them, through the authority of the respective trustees, acting collectively, can choose whether to follow Horejsi's advice in regard to a particular allocation/investment of funds.

money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." Defendants argue that under the teachings of *Howey* and its progeny, neither singly nor in the aggregate are defendants an investment company.

The third prong of the *Howey* test requires that there be an expectation of profit to be generated "through the efforts of others." In *Bailey v. J.W.K. Props., Inc,* 904 F. 2d 918, 922-3 (4th Cir. 1990 ), the Fourth Circuit held that to evaluate whether profits are deemed to come from the "efforts of others," the court must determine: (1) whether the investors have the authority to exercise control over the investments and (2) in light of the surrounding circumstances, whether the investors have the practical ability to exercise control. NRL's argument is that the trustees do not have the expertise of Horejsi to manage the formidable assets of the trusts (including the Lola Trust) over which he exercises, directly and indirectly, significant control (through various written agreements and undertakings), and therefore, having delegated plenary authority over those assets to Horejsi, the trusts, including the Lola Trust, should be treated for this purpose as "investors" relying on Horejsi, treated for this purpose as an "other," and therefore the entire "group" treated as an investment company. I reject this construct.

As a matter of law, whether the trustees of the trusts have the exact ability to do what Horejsi does is not determinative or particularly important. The heart of the matter is whether the trustees have the authority to exercise control and not whether or not the trustees choose to exercise that authority. As a matter of law, the trustees have the requisite authority and

have selected an affiliated person they know well, Horejsi, to advise them in the management of the funds under their control. This delegation of authority does not strip the trustees of their authority, notwithstanding the fact that two of the individual trustees did not even know of the tender offer in advance, because they ultimately have the ability to determine how funds are invested; if Horejsi fails to invest in a manner consistent with their wishes, they are fully able to alter or eliminate his role.

I am persuaded that, as a matter of law, Horejsi's efforts on behalf of the trustees of the trusts (of some of which he is a trustee), their beneficiaries (of some of which he is one), and the affiliated entities (in all of which he occupies various roles), do not constitute the "efforts of another" on behalf of "investors" so as to support the conclusion, urged by plaintiff, that the economic reality of the activities of the so-called "Horejsi Group" constitutes the "group" or any of the trusts an investment company within the contemplation of the 1940 Act. Accordingly, the Lola Trust is not barred by §12(d) from effecting the tender offer.

III.

The parties sought summary judgment on the claim, asserted in count ten of the supplemental counter-complaint, that even if a poison pill is available to a closed-end investment company (as I concluded in my earlier opinion, *see* 342 F.Supp.2d at 374-76), a closed-end investment company may not issue more than one poison pill in respect to a

single tender offer.[5] I am persuaded that, under the circumstances, plaintiff has not acted unlawfully.

Section 18(d) of the ICA expressly limits the duration of a subscription right issued by a closed-end investment company to "not later than one hundred and twenty days after [the] issuance" of such right. 15 U.S.C. § 80a-18(d).[6] Counterclaimants assert that NRL has violated and continues to violate § 18(d) by maintaining in effect a poison pill beyond the 120 day limit. On the other hand, NRL concedes, as it must, that §18(d) prohibits any *single* rights agreement that lasts more than 120 days, but argues that the statute does not prohibit the successive issuance of such rights, each expiring no later than 120 days after it is issued. It is undisputed that each of the serial rights agreements issued by NRL in respect to the tender offer by the Lola Trust, though similar, is a distinct and separate offering, both in form and substance.

---

[5]As mentioned earlier, for reasons that remain somewhat elusive to this judge, defendants chose not to appeal my October 2004 order denying their motion for preliminary injunction and sustaining the first poison pill adopted by plaintiff, notwithstanding their assertion that they "easily satisfy the requirements for . . . preliminary injunctive relief." *See* Paper No. 6 at 3. The Fourth Circuit would certainly have acted on an expedited basis to review the denial. *See, e.g., Dan river, Inc. v. Icahn*, 701 F.2d 278 (4th Cir. 1983)(explaining why it had earlier vacated a preliminary injunction issued "in the midst of a heated battle for corporate control").

[6]15 U.S.C. § 80a-18(d) provides as follows:
(d) Warrants and rights to subscription
It shall be unlawful for any registered management company to issue any warrant or *right to subscribe to or purchase a security of which such company is the issuer, except in the form of warrants or rights to subscribe expiring not later than one hundred and twenty days after their issuance* and issued exclusively and ratably to a class or classes of such company's security holders; except that any warrant may be issued in exchange for outstanding warrants in connection with a plan of reorganization. (Emphasis added).

Counterclaimants assert that the "plain language" of §18(d) precludes the use of serial rights agreements, but the statutory language does not bear the meaning that defendants place upon it. As a matter of law, each of the rights agreements adopted by NRL has indeed expired in less than 120 days. Nor does *SEC v. Sloan*, 436 U.S. 103 (1978), persuade me to alter that conclusion. In *Sloan*, the SEC, in response to the alleged dissemination of false and misleading press releases concerning certain business activities in respect to a company having exchange-listed shares, imposed a series of summary 10-day trading suspension orders that remained in effect for more than one year. The statutory language before the Court was 15 U.S.C. §78l(k), which provided as follows:

> If in its opinion the public interest and the protection of investors so require, the [SEC] is authorized summarily to suspend trading in any security (other than an exempted security) for a period not exceeding ten days . . . .

In defense of its summary orders, the SEC argued, *inter alia*, that its interpretation of the statutory language "furthers the statute's remedial purposes," *id*. at 115, and that,

> the . . . phrase ["for a period not exceeding ten days" was] a limitation only upon the duration of a single suspension order. [Thus], the Commission could indefinitely suspend trading in a security without any hearing or other procedural safeguards as long as it redetermined every 10 days that suspension was required by the public interest and for the protection of investors.

*Id*. at 112-13. In rejecting the SEC's arguments, the Supreme Court reasoned that while the SEC's interpretation of the statutory language was "not an impossible reading of the statute," *id*. at 113, "it [was] not the most natural or logical one." *Id*. Rather, the Court held that "[t]he duration limitation rather appears on its face to be just that-- a maximum time period for

which trading can be suspended for any single set of circumstances." *Id*. The Court further noted that, although due process concerns weighed in the outcome, it was "the language of the statute" which the Court found "persuasive in and of itself." *Id*.

I am not persuaded that the Supreme Court's "plain language" interpretation of the time limitation at issue in *Sloan* compels the conclusion that NRL is limited to a single "poison pill." Indeed, the Supreme Court itself noted that it is "not an impossible reading of" the 120 day limitation in 18(d) to interpret the statutory language as unconcerned with the *number* of poison pills, but rather, as the language suggests, as concerned only with the *duration* of any particular poison pill, it is indeed "the most natural [and] logical one." As relevant here, if Congress intended to limit a board's defensive options, it could easily have phrased the prohibition in terms of *duration and number*, rather than in terms of duration *simpliciter*.

This conclusion-- its "logic," is supported by consideration of the evident purposes of a legitimate poison pill. *See, e.g., Moore Corp., Ltd. v. Wallace Computer Services, Inc.*, 907 F.Supp. 1545 (D.Del. 1995). As Judge Schwartz explained:

> As an initial matter, the Court notes that poison pills serve legitimate functions which create no fiduciary duty issue. For example, if a hostile tender offer is commenced at a share value which the board, in good faith and after reasonable investigation, determines to be "inadequate," the board may justifiably leave the pill in place for a period of time so as to enable it to take steps necessary to protect and advance shareholder interests . . . . Such permissible actions include negotiation on behalf of the shareholders with the offeror, recapitalization or restructuring as an alternative to the offer, Revlon-style auctioning, should Revlon duties be triggered, or the arrangement for an otherwise better and value-maximizing alternative than that posed by the

>  tender offer . . . . After the period in which such alternatives may be considered has ended, and the board has determined that such alternatives are not feasible or, at any rate, not better for the shareholders, the legitimate role of the poison pill has expired . . . At that point, the only function the pill serves is to prevent the shareholders from exercising their right to tender, as the poison pill, once activated, effectively forecloses the consummation of the tender offer.

*Id.* at 1561. Even allowing for the important differences between closed-end investment companies and ordinary corporations, this reasoning is telling. The record does not reflect that the coercive tender offer effected by the Lola Trust was in any manner modified to increase value to NRL shareholders; nor has the Lola Trust has taken any substantial steps to conduct a reasonable negotiation with the NRL board to improve the tender offer. This is true, despite a dramatic increase in the market value of NRL shares throughout the pendency of this case. Accordingly, NRL's board has not acted in contravention of the IAC in adopting serial rights agreements pending a final resolution of the legality of its defensive measures taken in the good faith belief that shareholder value was at risk.[7] Accordingly, summary judgment has been granted in favor NRL on the issue of the lawfulness of the serial issuance of the poison pills.[8]

---

[7]Tellingly, there has been no challenge here to the business judgment of the NRL directors in maintaining the status quo during the pendency of this case.

[8]It also bears mention that, despite vigorous lobbying by counsel for all parties to this case, the SEC has stood by calmly on the sidelines throughout this dispute. Indeed, the SEC declined an offer communicated to it directly by the court to file an *amicus* brief in this case, which the parties describe repeatedly as a case of first impression in the closed-end fund industry. *But see WLR Foods, Inc. v. Tyson Foods, Inc.*, 65 F.3d 1172 (4th Cir. 1995)(sustaining ordinary corporation's --takeover target's-- defensive measures based on state law). In light of its overarching regulatory role in protecting shareholders, it would be curious for the SEC to

(continued...)

IV.

In my October 2004 opinion, I offered the following "observations" regarding the parties' dispute over the proper application of the Maryland Control Shares Acquisition Act ("MCSAA"):

> Although I need not reach the issue of whether voting restrictions imposed by the MCSAA are effective against the Trusts, I offer some observations on the issue. The statute provides that "[c]ontrol shares of the corporation acquired in a control share acquisition have no voting rights except to the extent approved by the stockholders at a meeting held under § 3-704 of this subtitle by the affirmative vote of two-thirds of all the votes entitled to be cast on the matter, excluding all interested shares." § 3-702(a). The statute also provides, however, that a closed-end investment company's resolution to be subject to the MCSAA is ineffective with respect to "any person who has become a holder of control shares before the time that the resolution is adopted." § 3-702(c)(4). The issue is whether the Trusts are "grandfathered" by qualifying as a person "who has become a holder of control shares" before the Board's adoption of a resolution opting in to the MCSAA.
>
> NRL asserts that it only makes sense to speak of a shareholder possessing "control shares" *at the time of* the opt-in and that a person "who has become a holder of control shares" still must be a holder of control shares at the time of the opt-in. NRL argues that it would be an absurd reading of the statute to interpret it so that any person who ever has held 10% of the stock *at any time* prior to the opt-in resolution could claim the statutory exemption. According to NRL, such a reading of the statute would severely compromise the MCSAA's effectiveness as an anti-takeover device, for it would mean that unknown numbers of shareholders from the distant past could make hostile takeover bids and claim exemption from the statute.
>
> The Trusts argue that the plain meaning of the statutory exemption dictates that the voting restrictions of § 3-702(a) do not apply to the Trusts. The Trusts were once a holder of control shares, and the exemption applies to "any person who has become a holder of control shares." The Trusts also maintain that consideration of the statute as a whole reveals a legislative intent

---

[8](...continued)
maintain its inactivity if it thought violations of federal securities laws were manifest.

that those who have become control shareholders before a board opts in to the MCSAA not be affected retroactively.

NRL's contention that a person cannot be described as a holder of "control shares" of a closed-end investment company before the adoption of an opt-in resolution is contradicted by the wording of the statute itself, which declares that a resolution "shall not be effective with respect to any person who has become a holder of control shares *before* the time that the resolution is adopted." § 3-702(c)(4) (emphasis added). On the other hand, NRL's second, policy-driven argument is somewhat persuasive. If the statute is interpreted so that anyone who *at any time* prior to the opt-in to the statute held 10% of a company's stock can claim exemption from the operation of § 3-702(a), a company will be unable to invoke the MCSAA against hostile bidders whose holdings once exceeded 10% but were diluted for any number of reasons, including, for example, a stock-for-stock merger.

Although ultimately I draw no conclusion with respect to the proper construction of the MCSAA, the arguments advanced by the Trusts are more convincing. Under the plain language of the statute, it appears that the voting restrictions of § 3-702(a) do not apply to the Trusts. The Trusts owned 10.05% of NRL stock on September 2, 2004. The Board did not opt in to the MCSAA until September 23, 2004. Thus, the Trusts should qualify as a person who *has become* a holder of control shares before NRL opted in to the MCSAA. If the legislature had wanted to exempt only those who had become control shareholders and remained control shareholders at the time of the adoption of a board resolution, it could have worded the statute more precisely so that it read, "the resolution shall not be effective with respect to any person who *is* a holder of control shares at the time that the resolution is adopted."

The legislative history of the MCSAA is instructive. The General Assembly was careful not to divest existing "control shareholders" of their voting rights at the time of the statute's enactment or amendment. Section 3-701(e)(2) ensures that shareholders who acquired "control shares" before the enactment of the statute in 1988 are not retroactively stripped of their voting rights. When the "control shares" threshold was reduced from 20% to 10% effective June 1, 2000, the General Assembly preserved the voting status of those who held more than 10% but less than 20% before that time. § 3-701(e)(2)(vi).

That the legislature took pains not to take away voting rights from shareholders who, before the time of enactment, had acquired what the statute newly defined as "control shares" is not necessarily an indicator that the legislature meant to "grandfather" any person who had only *temporarily* acquired control shares of a closed-end investment company after June 1, 2000

and was not a control shareholder at the time of the board's opting in. However, construing the statute to protect the Trusts' status as a "person who has become a holder of control shares before the time that the resolution is adopted" would be consistent with the entire legislative scheme which protects those who had no notice that they could be considered "control shareholders" before the time they acquired "control shares." When the Trusts first acquired control shares, NRL had not yet opted in to the MCSAA. The timing and size of the Board's Private Placement and the timing of its resolution opting in to the MCSAA demonstrate that the Trusts did not voluntarily divest themselves of control shares before the adoption of the resolution. It would seem unfair to allow NRL to invoke the MCSAA against the Trusts under these circumstances.

I am persuaded that this analysis of the statute was the appropriate one and so I here adopt it in full as my ruling. As the Lola Trust did not voluntarily divest itself of what amounted to "control shares" before the NRL board's opt-in, it remains free to vote those shares unfettered by the proscriptions of the statute.[9]

The sole remaining issue is whether the Lola Trust's exemption from the restrictions of MCSAA is capped at the quantity of "control shares" it owned as of NRL's opt-in, or instead, is free of the statute's restrictions for all shares it obtains even after the opt-in. I conclude that the only reasonable interpretation of the statute is to cap the Lola Trust's exemption at the number of shares it held at the time of the opt-in.

Assuming that the Maryland legislature intended to "grandfather" shareholders who owned shares exceeding the statute's control share minimum, there is no reason to suppose that the legislature intended to permit such a shareholder to amass a majority of voting

---

[9]The record shows that although the Ernest Trust is no longer a tender offeror, the Lola Trust independently owned more than 10% of NRL as a result of its 2004 purchases prior to the opt-in.

control under the limited exemption it enacted. If the statute were interpreted in such a manner, then the protection the law intended to afford to minority shareholders from coercive, hostile takeover attempts would be merely illusory. I cannot ascribe such an intent to the Maryland General Assembly, which clearly would have known that, under federal law, a board would have sufficient time after learning of a potential tender offeror's purchase of ten percent of the outstanding voting shares of a covered company to opt-in to the MCSAA. To adopt counterclaimants' interpretation of the statutory framework would deny that reality. I decline to do so, and thus I granted judgment in favor of plaintiff on the question of whether the Lola Trust's unfettered voting rights were capped at the quantity of shares it owned prior to plaintiff's opt-in.

V.

The motions for summary judgment filed by all parties on the Williams Act claim will be denied. There exist genuine disputes of material fact as to whether the tender offer (as amended on October 4, 2004) contains false and/or misleading statements. If this issue is not rendered effectively moot by the foregoing analyses, then a prompt trial will be calendared.

VI.

The parties sought summary judgment on the claim that NRL violated the prohibition against insider trading when it completed the private placement of NRL common stock to its affiliate, NBLLC, after the tender offer commenced. NRL asserts that the prohibition against insider trading was designed to prevent individuals with inside information about a

tender offer from trading *in the market*, to the disadvantage of market participants and stockholders who did not have the benefit of the inside information. NRL notes that market prices reflect natural market forces and prices are not manipulated by a single party who possesses information not available to the public at large but who does not enter into transactions in the market. NRL emphasizes that it engaged in a private placement whereby NBLLC purchased the shares directly from NRL and not in the open market. I agree that counterclaimants have failed to project evidence that they suffered any harm by virtue of the private placement and conclude that, as a matter of law, plaintiff is entitled to judgment on counterclaim for "insider trading."

## VII.

The parties seek summary judgment on the counterclaim for tortious interference with business relations. Under Maryland law, the elements required to establish a wrongful interference with contractual or business relations are as follows: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice) and (4) actual damage and loss resulting." *Ultrasound Imaging Corp. v. Am. Soc'y of Breast Surgeons*, 358 F. Supp. 2d 475, 481 (D. Md. 2005).

Counterclaimants contend that NRL's defensive mechanisms undertaken to thwart the tender offer have interfered with their ability to do business and that those mechanisms

that NRL employed were unlawful. NRL alleges that they were justified in employing defensive tactics for shareholder protection and that such actions were not taken maliciously. As I have concluded that NRL acted in accordance with law in seeking to thwart the tender offer, this claim fails as a matter of law

## VIII.

For the reasons stated above, the cross-motions for summary judgment have been granted in part and denied in part.

Filed: May 8, 2007                                        /s/
                                              Andre M. Davis
                                              United States District Judge